**In re CANDOR DIAMOND CORP., Debtor.**

**Daniel McCOLLEY, Trustee of Candor Diamond Corp., Plaintiff,**

v.

**Chanoch Henoch ROSENBERG, Romex Diamonds Corp., RY Diamond Co., Inc., and Achim Diamond Corp., Defendants.**

Bankruptcy No. 81 B 11594 (TLB).
Adv. No. 82–5603A.

United States Bankruptcy Court,
S.D. New York.

Aug. 11, 1987.

See also, Bkrtcy., 68 B.R. 588.

Stroock & Stroock & Lavan by Lawrence M. Handelsman, Robin E. Keller, Sherry J. Millman, New York City, for trustee.

Finkel, Goldstein & Berzow by Harold S. Berzow, Kevin J. Nash, New York City, for Chanoch Rosenberg, Romex Diamonds Corp. & Ry Diamond Co.

## DECISION ON TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CHANOCH HENOCH ROSENBERG, ROMEX DIAMONDS CORP. AND RY DIAMOND CO., INC.

TINA L. BROZMAN, Bankruptcy Judge.

The fraud that has pervaded the Candor Diamond Corp. ("Candor") bankruptcy again surfaces, this time in an adversary proceeding in which the trustee is seeking partial summary judgment to recover fraudulent transfers from three of the four defendants (the three are collectively called "defendants"). The defendants do not materially dispute the existence of or their participation in the fraudulent schemes alleged by the trustee. Instead the defendants offer several inapplicable or unpersuasive legal defenses. Accordingly, we grant the trustee's motion for partial summary judgment.

### I.

#### A. *The Criminal Proceedings*

Prior to its bankruptcy, Candor bought and sold loose gems and manufactured and sold jewelry. On August 10, 1981, an involuntary petition in bankruptcy was filed against Candor. On November 9, 1981, an order for relief was entered following which Daniel McColley was appointed chapter 7 trustee ("Trustee").

Irwin Margolies ("Margolies"), the principal of Candor, diverted massive sums of money from Candor and its creditors to his personal use. He was indicted and pleaded guilty in 1982 to various charges of bankruptcy fraud.

Chanoch Rosenberg ("Rosenberg") and his wholly-owned companies, Romex Diamond Corp. ("Romex")[1] and Ry Diamond Co., Inc. ("Ry") (the corporations, collectively, being called the "Rosenberg Entities") participated in at least one of Margolies' frauds. Margolies had been funneling money out of Candor and into the Rosenberg Entities by making payments for diamond purchases which did not occur. The scheme was fairly simple: Rosenberg would issue fictitious invoices for goods not delivered, receive payment from Candor, utilize Candor's funds in his own businesses and eventually return the funds to Margolies and/or his family. In January 1985 an information was issued charging Rosenberg with bankruptcy fraud ("Information"). Specifically, the Information charged that Rosenberg, together with Margolies and others, "unlawfully, wilfully, knowingly and fraudulently transferred and concealed the property of a corporation with intent to defeat the provisions of Title 11 by converting approximately $450,000 of Candor Diamond Corp. checks into cash." These actions constituted a violation of 18 U.S.C. § 152; Rosenberg pleaded guilty.

#### B. *The Adversary Proceeding*

In this proceeding, the Trustee seeks recovery of the Candor funds described in the Information. After reviewing Candor's cancelled checks and bank statements, the Trustee had commenced a garden variety preference action against Romex on April 28, 1982. Unfortunately, because Candor's books and records had vanished, the Trustee's efforts to untangle its affairs were severely hampered and he was required to rely on the fruits of discovery and examinations pursuant to Rule 205 of the former Federal Rules of Bankruptcy Procedure to an extent perhaps greater than in most bankruptcy cases.

**1.** After this adversary proceeding was begun but before the summary judgment motion was made, an entity called Romex Corp., which in its Statement of Affairs claims to be the successor of Romex, filed a Chapter 11 petition. An operating trustee was later appointed. That trustee was never substituted for Romex in this adversary proceeding nor was his counsel substituted for Romex's counsel. But by letter dated July 10, 1987 the operating trustee informed the court that he did not wish to participate in the action and that he had no objection to the granting of the motion for partial summary judgment against Romex. Accordingly, we see no bar to the consideration of the motion.

Discovery ensued in the preference action. In answering interrogatories directed to Romex, Rosenberg swore that Romex and Ry sold over a million dollars worth of goods to Candor from March through July 1981 and were paid in full. Thereafter, the Trustee's attorneys conducted a deposition of Romex and an examination of Ry,[2] Rosenberg appearing on behalf of both companies. The sum and substance of Rosenberg's testimony was that all of the payments to the Rosenberg Entities were made in the ordinary course of business in exchange for diamonds delivered substantially contemporaneously with those payments. Rosenberg even submitted Romex and Ry invoices purporting to evidence these sales.

Having obtained this discovery pertaining to the alleged preferences and the Rosenberg Entities' seemingly legitimate transactions with Candor, and at the request of the United States Attorney, the Trustee held in abeyance the prosecution of his action. When the Information was later issued, the Trustee first discovered that Rosenberg was receiving hundreds of thousands of Candor's dollars as part of a laundering scheme. These facts were wholly at odds with Romex's answers to interrogatories and the deposition testimony. Consequently, the Trustee moved for leave of this court to (i) name Rosenberg and Ry as defendants in the Romex action; (ii) consolidate this action with an ongoing adversary proceeding against Achim Diamond Corp. ("Achim"), a related company which transacted business with Candor through Rosenberg; and (iii) file an amended complaint for recovery of fraudulent conveyances. On June 24, 1985, we granted the Trustee's motion. An amended complaint was filed.

The amended complaint alleges that during the one year prior to the filing date, Candor transferred in excess of one million dollars to the defendants without receiving any goods or services in exchange for some or all of these transfers. It also alleges that Rosenberg and the other defendants were engaged in a conspiracy with Margolies to embezzle and conceal Candor's funds from its legitimate creditors. The three claims for relief are based upon fraudulent transfers grounded in actual and constructive fraud. *See* 11 U.S.C. § 548.

After service of the amended complaint and amended answer, the Trustee again conducted discovery. Rosenberg was deposed as a defendant in his individual capacity and as the shareholder and officer of Romex and Ry (the "third Rosenberg deposition"). Finally, he told the truth. He admitted that he had received Candor checks in excess of one million dollars payable to Ry and Romex, had deposited those checks into the accounts of the Rosenberg Entities and had used the funds in connection with those businesses. He also admitted that, on certain occasions, he had received payments and provided invoices purporting to evidence the sale of goods which were never delivered. Rosenberg testified that between June 16, 1981 and July 1, 1981, he gave Margolies $20,844 in Romex invoices without delivering goods, received a Candor check and delivered the proceeds of the check to Margolies. Similar but significantly larger transactions occurred soon after. Rosenberg admitted that in payment of Romex invoices dated July 13 and July 15, 1981 and totaling $357,328 and in payment a Ry invoice dated July 17, 1981 in the amount of $252,314, he received approximately $600,000 for goods worth only $150,000, leaving an approximate $450,000 shortfall. This shortfall is the amount recited in the Information to which he pleaded guilty.

In support of his motion for summary judgment the Trustee proffers a Candor memorandum ("Memorandum") furnished to him by the Federal Bureau of Investigation. The Memorandum is signed by Rosenberg and apparently acknowledges Rosenberg's receipt of $445,457.96 for undelivered goods. A request for admissions concerning the Memorandum was served upon Rosenberg on March 24, 1984. He filed an untimely response on June 4, 1984.

---

**2.** The examination was conducted pursuant to Rule 205 of the former Federal Rules of Bankruptcy Procedure, the current analog for which is Rule 2004. For purposes of this decision, we refer to Rosenberg's deposition and examination collectively as his "depositions."

Accordingly, the Trustee has asked this court to deem admitted the following statements:

 (a) The Memorandum refers to the value of goods purportedly delivered by Rosenberg to Candor on certain invoices.

 (b) Rosenberg has delivered to Plaintiff the invoices referred to in subparagraph (a) hereof.

 (c) As evidenced by the Memorandum, goods totalling $445,457.96 in value were invoiced but not delivered to Candor.

 (d) Rosenberg received cash from Margolies in the amount of $445,457.96 for goods not delivered, for which he signed the memorandum.

 (e) The Memorandum constitutes an I.O.U. from Rosenberg to Candor.

In his untimely response, without admitting the authenticity of the Memorandum, Rosenberg acknowledged his receipt of $450,000 in checks from Margolies and/or Candor for goods which were invoiced but not delivered. We do not know from this record the amounts of the individual checks nor their payees. One of the figures on the Memorandum is the exact amount of the Ry invoice. Thus, if we deem the statements admitted, we can infer that Ry probably received the $252,314 in cash without delivering goods in return and that the balance of $193,143.96 probably represents the difference between the cash received by Romex and the goods which it delivered to Candor.

## II.

Relying on Margolies' plea, Rosenberg's plea, the third Rosenberg deposition, the invoices, and the admissions, the Trustee asserts that he has made out a *prime facie* case of actual and constructive fraudulent transfers. He seeks judgment against all defendants in the amount of $466,301.96 ($20,844.00 plus $445,457.96) and an order directing payment to the estate of that amount less $180,000 already recovered. He also seeks from all defendants recovery of costs and attorneys' fees as a result of

their obstruction of his investigation and their opposition to the motion for partial summary judgment. The Trustee also bases his attorneys' fee request on Rosenberg's knowing concealment of $180,000 of Candor's funds which the Trustee spent many years recovering and on Rosenberg's failure to make restitution to the estate as he represented at his allocution he would do.

Although the defendants' amended answer denies the material allegations of the Trustee's amended complaint, their statement filed pursuant to Local Civil Rule 3(g) and Local Bankruptcy Rule 13(h) ("3(g) Statement") does not materially dispute the fraudulent transfer elements. Instead, the defendants raise several defenses to oppose the granting of summary judgment:

 (1) The statute of limitations bars the action and was not tolled despite their fraud because the Trustee had or should have had independent knowledge of a fraudulent conveyance.

 (2) Rosenberg acted under duress consisting of threats of violence and bodily harm and thus the defendants should not be liable.

 (3) Alternatively, damages cannot be assessed without taking into consideration the fact that substantial monies were repaid to Margolies or his designees.

## III.

### A. *Section 548 Violations*

 Bankruptcy Code section 548 allows a trustee to avoid transfers of the debtor's property made within one year before the filing of the petition if the debtor made such transfers with actual intent to hinder, delay or defraud its creditors. That the Trustee has proven a *prima facie* fraudulent transfer case is beyond dispute. From the facts established by the Margolies indictment, his guilty plea, the Information charging Rosenberg and his guilty plea, the fictitious invoices and the fruits of the discovery [3] in this action, there can be

---

3. We deem admitted the statements contained

in the Trustee's Request for Admissions served

no doubt that Margolies and his cohorts transferred at least $466,301.96 to Rosenberg for himself and the Rosenberg Entities with the actual intent to hinder, delay or defraud Candor's creditors. Further, it is clear that Rosenberg either directly delivered or subsequently transferred the funds to the Rosenberg Entities, although in what precise amounts we cannot tell from this record. Indeed, the Trustee's 3(g) Statement, which is not materially controverted by the defendants,[4] lays out the section 548 elements.[5]

▇ Similarly, the Trustee has made out a *prima facie* case of constructive fraud, specifically, that the transfers of $466,301.96 were made within one year before the filing of the petition for less than a reasonably equivalent value in exchange for the transfers at a time when the debtor was or was rendered insolvent. The defendants controvert none of the elements of the Trustee's *prima facie* case save for "reasonably equivalent value." [6] Although the defendants have admitted that the transfers for which the Trustee seeks summary judgment were made for no consideration paid to Candor [7] they urge us to consider as value flowing to Candor amounts which Rosenberg repaid to Margolies and his family. Under the circumstances of this case, that would be inappropriate. The money having never benefitted the corporation, it cannot be said to be value flowing to Candor. *See generally* 4 L. King, Collier on Bankruptcy ¶ 548.07 at 548–82 (15th ed. 1987); *cf. Coors of North Mississippi, Inc. v. Bank of Longview (In re Coors of North Mississippi, Inc.),* 66 B.R. 845 (Bankr.N.D.Miss.1986) (where payments were made by purchasers of debtor corporation to debtor's principal who tendered them to the debtor's secured lender in re-

March 24, 1986 to which Rosenberg responded some 74 days later. Fed.R.Civ.P. 36, applicable to bankruptcy through Fed.R.Bankr.P. 7036, governs admissions and deems matters admitted to which responses are not given within 30 days after service of the request.

Certainly, under compelling circumstances a court may allow untimely replies to avoid the admissions. *Moosman v. Joseph P. Blitz, Inc.,* 358 F.2d 686, 688 (2d Cir.1966). Where the presentation of the merits will be aided and where no prejudice to the party obtaining the admission will result, a court has the power to make an exception to Rule 36. *Donovan v. Carls Drug Co., Inc.,* 703 F.2d 650, 652 (2d Cir. 1983). However, "the language of the Rule is permissive [and thus] the court is not required to make an exception to Rule 36 even if both the merits and prejudice issues cut in favor of the party seeking exception to the rule." *Id.* at 652; *see Moosman, supra.*

Rosenberg does not argue that the statements should not be deemed admitted. Nor will we gratuitously relieve him of the admissions because he has obstructed the Trustee's path by testifying falsely and submitting false and misleading documents. We note, however, that *most, if not all,* of the admissions are cumulative of the already undisputed facts (see, for example, Deposition of Chanoch Rosenberg dated October 9, 1985 at pages 36–37) and that Rosenberg in his untimely response admitted to invoicing approximately $450,000 of goods which were not delivered.

4. In paragraph 16 of the Trustee's 3(g) Statement, he states that "the purpose of the Unlawful Transfers was to launder Candor monies for the future use and benefit of Irwin Margolies, his family and others." The defendants counter, in part, that Rosenberg intended to deliver the diamonds to Candor. As to the Trustee's *prima facie* case under section 548, *Rosenberg's* intent is irrelevant; what is critical is the debtor's intent, which is undisputed here. Trustee's 3(g) Statement para. 19. Rosenberg's intent is relevant to the good faith defense which we later address.

5. See paragraphs 10, 11, 12, 13, 14, 18 and 19 of the Trustee's 3(g) Statement, none of which are controverted in any respect.

6. See paragraphs 10, 11, 12, 13, 14, 18, 21 and 24 of the Trustee's 3(g) statement and the defendants' counter-statement.

As to the element of insolvency, which is among those not challenged by the defendants, the Trustee has sworn that, as of the filing date, the liabilities of Candor (whose filed claims exceed $6,000,000) far exceeded its assets, as evidenced by his recoveries of under $1,000,000 after almost six years of bankruptcy liquidation. By retrojection, we can assume that Candor was also insolvent or was rendered insolvent when the transfers were made in June and July, 1981, between three and seven weeks before the petition was filed. *See Braunstein v. Massachusetts Bank & Trust Company,* 443 F.2d 1281, 1284 (1st Cir.1971); *Hassan v. Middlesex County National Bank,* 333 F.2d 838, 840 (1st Cir.), *cert. denied,* 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964).

7. See the Deposition of Chanoch Rosenberg dated October 9, 1985, at pages 35–37, 73–75 and 78.

turn for which the debtor received a dollar-for-dollar reduction of debt, the debtor received reasonably equivalent value even though the principal had guaranteed the debtor's debt and his liability was thereby diminished). We take the asserted defenses in turn.

### B. *Defenses*

### 1. STATUTE OF LIMITATIONS

The amended complaint was filed more than four years following the Trustee's appointment; the defendants argue that the claim is thus time barred pursuant to section 546(a).[8] The Trustee, contending that the statute has been tolled as a result of Rosenberg's concealment of the fraud, seeks to invoke the doctrine long ago announced in *Bailey v. Glover*, 88 U.S. 342 (21 Wall. 1874, 22 L.Ed. 636).

> [W]hen there has been no negligence or laches on the part of the plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed ... the statute does not begin to run until the fraud is discovered by, or becomes known to the party suing....

*Id.* at 349–50. This equitable doctrine is read into every federal statute of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *Dabney v. Levy*, 191 F.2d 201 (2d Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951), *reh. denied*, 342 U.S. 911, 72 S.Ct. 301, 96 L.Ed. 682 (1952). Under the modern formulation of the doctrine, the statute does not begin to run until "the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir.1974).

Rule 56(c) of the Federal Rules of Civil Procedure, applicable here by virtue of Fed.R.Bankr.P. 7056, provides that the court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". *See Knight v. U.S. Fire Insurance Company*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of unresolved factual issues which are not material to the outcome of the dispute will not prevent summary judgment from issuing. *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). While it is true that fraud actions should generally not be disposed of summarily, *see Friedman v. Meyers*, 482 F.2d 435 (2d Cir.1973), summary judgment is appropriate in a fraud action where, as here, there is no genuine issue of material fact. *Jackson v. Star Sprinkler Corp.*, 575 F.2d 1223, 1234 (8th Cir.1978); *see In re Esposito*, 44 B.R. 817, 821 (Bankr. S.D.N.Y.1984); 6 J. Moore and J. Wicker, Moore's Federal Practice ¶ 56.17[27] at 56–869–70 (2d ed. 1987); *see, e.g., Murray v. Xerox Corp.*, 811 F.2d 118 (2d Cir.1987). A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment when the moving party has carried its burden. *Id.; see Matsushita Electrical Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet the defendants give us exactly that, speculation and conjecture.

The Trustee has unequivocally demonstrated that tolling is appropriate. The fraudulent transactions were constructed and even documented to appear legitimate. Moreover, the fraudulent nature of the transactions was later actively concealed by the defendants when they supplied the Trustee with false answers to interrogato-

---

**8.** 11 U.S.C. § 546, entitled "Limitations on avoiding powers" reads in relevant part as follows:

 (a) An action or proceeding under sections 544, 545, 547, 548 or 553 of this title may not be commenced after the earlier of—

 (1) two years after the appointment of a trustee under section 702, 1104, 1163 or 1302 of this title; or

 (2) the time the case is closed or dismissed.

ries, false deposition testimony and fictitious invoices.

This damning set of facts speaks for itself. Although the initial fraud may very well have been sufficient to toll the statute of limitations, there can be no doubt that the defendants' active, deliberate and consistent concealment of the fraudulent transfers requires us to invoke the *Bailey* doctrine. *See Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985).

To all of this the defendants lamely assert that the Trustee "was at least suspicious of the transactions" and thus a "hearing is needed to determine whether the Trustee had sufficient independent knowledge to commence a timely action." Defendants' Memorandum of Law at 9–10. Rosenberg's affirmation baldly claims that the Trustee was suspicious of the disputed transactions because of their size and close timing. Aff. of Chanoch Rosenberg in Opp. at para. 13. This is disingenuous at best for two reasons, first, because the defendants took discovery on the state of the Trustee's knowledge and suspicion yet have failed to show us even one line of testimony to support their position [9], and second, because Rosenberg repeatedly assured the Trustee's counsel that the size and timing of the transactions were neither unusual nor suspicious.[10]

## 2. REPAYMENT

██ The defendants ask that we take into account when assessing damages the fact that Rosenberg allegedly repaid to Margolies and his family or associates some of the monies which the Trustee seeks to recover.[11] Although the defense is not styled as such, the defendants apparently seek the benefit of 11 U.S.C. §§ 548(c) and § 550(b). The former permits an initial transferee who takes for value and in good faith to retain any interest transferred to the extent the transferee gave value to the debtor in exchange for the transfer; the latter permits an immediate good faith transferee of the initial transferee to retain the property transferred if the immediate transferee gave value, in good faith, and without knowledge of the voidability of the transfer avoided.

The defendants bear the burden of demonstrating that they are entitled to the benefits of section 548(c). *Consumers Credit Union v. Widett (In re Health Gourmet, Inc.)*, 29 B.R. 673, 677 (Bankr.D. Miss.1983). But they have shown us nothing to persuade us that the defense is available to reduce their liability.

██ Our analysis begins and ends with a look at the first element of section 548(c), good faith. That element is indispensable. *Consone v. Cohen (In re Roco Corporation)*, 701 F.2d 978, 984 (1st Cir. 1983). Awareness of the fraudulent purpose is inconsistent with the notion of good faith. *Parker v. Sherman*, 212 F. 917 (2d Cir.1914). *Accord* 4 L. King, Collier on Bankruptcy ¶ 548.07 at 548–68 (15th ed. 1987). Rosenberg having pleaded guilty to the charge that he "unlawfully, wilfully, knowingly and fraudulently transferred and concealed property of a corporation with intent to defeat the provisions of Title 11 by converting approximately $450,000 of Candor Diamond Corp. checks into cash", the defendants wisely refrain from claiming good faith. Indeed, Rosenberg in his affidavit admits his participation in withholding Candor funds. But he asks this court to recognize that his actions did not "even remotely [rise] to the levels of criminality associated with Irwin Margolies and his associates." Rosenberg Aff. at ¶ 4. This assertion does not work to supply the necessary good faith which Rosenberg admittedly lacked. Rosenberg's bad faith must be imputed to the corporate defendants as well because as their management and sole shareholder, he was in a position to control their actions. *See Roco Corporation, supra*, 701 F.2d at 984. *See also McGraw v. Allen (In re Bell & Beckwith)*, 64 B.R. 620, 630 (Bankr.N.D.Ohio 1986).

---

**9.** They nowhere suggest that they need more discovery on this issue. *See* Fed.R.Civ.P. 56(f).

**10.** *See, e.g.,* the quotations in footnote 17, *infra.*

**11.** Rosenberg has not quantified the amount of money which he claims he repaid.

Accordingly, section 548(c) is inapplicable. For the same reason, the corporate defendants are not shielded under section 550(b), if they be considered not initial, but immediate, transferees.[12]

### 3. DURESS

The defendants' final defense is duress. Based upon the undisputed facts as Rosenberg relates them, the defense is not only legally but factually untenable.

■ As a general matter, duress is not a valid defense to the Trustee's avoiding powers under section 548.[13] Congress specifically set forth in section 548(c) the method of saving, to the extent of value given, a transfer otherwise invalid under the fraudulent transfer provisions of the Code. *See* 4 L.King, Collier on Bankruptcy, ¶ 548.07 at 548–69–70 (15th ed. 1987). Rosenberg's argument is no more than an equitable appeal for us to engraft onto section 548 an additional defense. We decline to do so.

■ Our equitable powers must be exercised consistently with the Bankruptcy Code. *See Johnson v. First National Bank,* 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015,

79 L.Ed.2d 245 (1984). The party who is seeking to obtain the benefits of an exception to the prohibition of section 548 bears the burden of persuasion. *U.S. v. First National City Bank,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). And, "[a]s a general rule of statutory construction, where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of contrary legislative intent." *McColley v. M. Fabrikant & Sons, Inc. (In re Candor Diamond Corp.),* 26 B.R. 850, 851 (Bankr.S.D.N.Y.1983) citing *Andrus v. Glover Construction Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980). *See generally American Progressive Life and Health Insurance Co. v. Corcoran,* 715 F.2d 784, 787 (2d Cir.1983). Nothing in the Code or in the argument advanced impels us to the conclusion that the good faith exception is non-exclusive. Thus, we decline the invitation to adopt the defense.

■ But equally important, even if available to defeat a fraudulent transfer action, the defense would here fail for Rosenberg testified that he entered into the money-laundering scheme freely and of

---

**12.** We note also that sections 548(c) and 550(b) would be inapplicable because the defendants did not give value *to the debtor* but instead paid money to Margolies and his associates. As we indicated above, the money having never benefitted the corporation, it cannot be said to be value flowing to Candor. *See generally* 4 L.King, Collier on Bankruptcy ¶ 548.07 at 548–82 (15th ed. 1987). Any claim that Rosenberg thought he was repaying Candor is, of course, absurd in light of his admitted participation in a laundering scheme (Rosenberg affirmation in opposition dated September 25, 1986 at ¶¶ 3, 4 and 6) and his plea of guilty to knowingly and fraudulently transferring and concealing the property of a corporation with intent to defeat the provisions of Title 11. (We note that Rosenberg is not seeking to controvert that plea in any manner. See Defendants' Memorandum of Law at page 2.)

Nor could the theory of setoff, as embraced in code section 553, be available. The required mutuality is lacking because Margolies is a distinct and separate person from Candor. Further, and more importantly, to permit setoff under these conditions would operate to "legalize a payment which was fraudulent, and to do by indirection what could not be done directly."

*Bennett v. Rodman & English, Inc.,* 2 F.Supp. 355, 358 (E.D.N.Y.1932). *Accord Irving Trust Co. v. Frimitt,* 1 1 F.Supp. 16 (S.D.N.Y.1932); *Hassett v. Weissman, (In re O.P.M. Leasing Services, Inc.),* 35 B.R. 854, 868 (Bankr.S.D.N.Y. 1983); *modified* 48 B.R. 824 (S.D.N.Y.1985).

Recoupment is also unavailable to defeat the Trustee's motion. It is an equitable remedy. *Ashland Petroleum Company v. Appel (In re B & L Oil Company),* 782 F.2d 144, 159 (10th Cir. 1986). Under no circumstances can defendants be said to have come here with clean hands. As we just stated with respect to the setoff theory, a defendant should not be able to effectively legitimate a fraudulent transfer by indirection. Further, since the "repayments" were made to Margolies, and not to Candor, they should not be available to reduce liability to the entity whose property was fraudulently transferred.

**13.** It is arguable that, if proven, duress could negative the bad faith of the transferee, permitting him to invoke the good faith savings provision of section 548(c). But because we find Rosenberg's claimed duress factually untenable and because we find the savings provision otherwise inapplicable, *see* note 12, *supra,* we need not reach the question of whether duress is available in the context of section 548(c).

his own accord in early 1981 in order to "cement a relationship with a valuable customer ..." and he admitted that he delivered phony invoices and received checks in payment long in advance of threats being made against him. (Rosenberg deposition of October 9, 1985 at pp. 88–89 and 124–29; Rosenberg affirmation in opposition dated September 25, 1986 at ¶ 6.) In fact, all of the invoices underlying the Trustee's motion for partial summary judgment pre-date August 1981, the month when the threats began. (Rosenberg deposition of October 9, 1985 at p. 125.) And the threats accompanied Margolies' and his family's demands for cash payments in *repayment* of amounts previously given to Rosenberg. (Rosenberg deposition of October 9, 1985 at pp. 124–29; Rosenberg affirmation in opposition dated September 25, 1986 at ¶ 7.) Nowhere does there appear any evidence that Margolies somehow coerced Rosenberg into accepting the transfers of Candor's property. Accordingly, the undisputed facts eviscerate the defense.

### IV.

Pointing to Rosenberg's blatantly false testimony at his depositions, the Rosenberg Entities' fictitious invoices, Romex's false answers to interrogatories, and the defendants' opposition to this motion, the Trustee seeks from the defendants payment of attorneys' fees and costs incurred in connection with the original complaint, the amended complaint and this motion.[14] In short, the Trustee seeks all fees and costs incurred during this entire suit. He relies on Fed.R.Bankr.P. 9011 and this court's inherent powers. For the reasons that follow, we believe a partial award is appropriate but await the submission of an application for fees before fixing an amount.

A. *Fees and Costs Incurred In Connection with the Original Complaint*

■ Although the "American Rule" provides that the prevailing party ordinari-

ly is not entitled to collect an attorneys' fee from the loser, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), one exception permits courts, under their inherent power to supervise and control their own proceedings, to award a reasonable attorneys' fee to the prevailing party when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." *F.D. Rich Co., Inc. v. United States ex. rel. Industrial Lumber Co. Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986), cert. denied sub nom. *Suffolk County v. Graceck*, —— U.S. ——, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). An award may be granted against the losing party or against the attorney. *Id.*

■ It is not simply the commencement of a suit in bad faith that can give rise to the imposition of attorneys' fees. For if a party *conducts* the litigation in bad faith, by asserting, for example, meritless defenses, an award of attorneys' fees may well be appropriate. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Nemeroff v. Abelson*, 620 F.2d 339, 350 (2d Cir.1980); *see Faraci v. Hickey-Freeman Co., Inc.*, 607 F.2d 1025, 1028 (2d Cir.1979). This type of improper conduct is sometimes denominated "procedural bad faith." *Browning Debenture Holders' Committee v. DASA Corporation*, 560 F.2d 1078, 1088–89 (2d Cir.1977).

■ It is under this theory that we believe an award of attorneys' fees against the defendants is appropriate because of their conduct during discovery. That conduct was designed to mislead the Trustee into believing that the transactions were legitimate.[15] The nature and extent of the

---

14. No award is sought against defendants' counsel.

15. A couple of illustrations will show just how brazenly Rosenberg undertook to throw the Trustee off his scent.

Q. How often would you say you did business with Candor from March on?
A. From March on, sometimes it was every—I see five days. He looked at the goods and told me two days he wants to buy them, probably. Probably every week or every two

obstructive conduct (which included the false testimony and fictitious invoices) is set out in the facts above. Accordingly, after we review the Trustee's fee application, we will award attorneys' fees to compensate the Trustee for those expenses incurred to meet the procedural bad faith moves. *Browning Debenture Holders' Committee v. DASA Corporation,* 560 F.2d 1078, 1088–89 (2d Cir.1977). Although an award of costs or attorneys' fees based on bad faith is personal, and will not ordinarily be imputed from one party to a co-party, where, as here, the corporate defendants are wholly-owned and managed by the individual defendant, who acted in bad faith in both his individual and corporate capacities, an award against all the defendants is appropriate. *See Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702, 707 (1973); *Browning,* 560 F.2d at 1089; *see also Tennessee Pools and Recreation, Inc. v. Mr. Pools (In re Tennessee Pools and Recreation, Inc.),* 36 B.R. 602 (Bankr.M.D.Tenn.1983).

## B. *The Amended Complaint and the Instant Summary Judgment Motion*

We believe that pursuant to Fed.R. Bankr.P. 9011 and Fed.R.Civ.P. 11 a fee award is appropriate in conjunction with the statute of limitations defense to the partial summary judgment motion.[16] Rule 11 provides a more expansive standard for the award of attorneys' fees than does the *Alyeska Pipeline* formulation. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985); *see Abraham v. United States,* 582 F.Supp. 257 (S.D.N.Y.) *aff'd* 740 F.2d 2 (2d Cir.1984). The rule is mandatory, requiring the imposition of sanctions

> against an attorney and/or his client when it appears that a pleading [motion or other paper] has been interposed for any improper purpose, or where after reasonable inquiry, [an attorney or party] could not form a reasonable belief that the pleading [motion or other paper] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

*Eastway,* 762 F.2d at 254; Fed.R.Civ.P. 11.

 With this in mind, we cannot say that the filing of defendants' *answer* occasions Rule 11 sanctions. Although we are unpersuaded by the duress and repayment defenses, we cannot say that it was "patently clear" that they had "absolutely no chance of success." *Eastway,* 762 F.2d at 254; *Machleder v. Diaz,* 538 F.Supp. 1364, 1376 (S.D.N.Y.1982). Indeed, in reviewing requests for rule 11 sanctions we must be

weeks, every three weeks, depending on how fast he would buy.
Q. Each time you delivered fairly substantial amounts of gems and he paid on the spot; is that right?
A. Yes.
Q. Between May 12th of '81 and August 10th of '81, approximately what was the value of the goods you sold to Candor?
\* \* \* \* \* \*
A: Approximately $550,000.
Deposition of Romex Diamond Corp., November 18, 1982 at pages 22–23.
Q: Is it correct to say that essentially there were three occasions on which you delivered goods to Candor as Ry?
A: Yes.
Q: And those occasions were April 13th, '81, May 18, '81 and July 17, '81?
A: Yes. I wish to state that these goods were not all delivered at once.
\* \* \* \* \* \*
Q: Overall, the total volume, the total value of goods that you delivered on the Ry invoices to Candor is approximately what?

A: About $455,000.
Q: Mr. Rosenberg, adding the transactions you did on behalf of Ry to the transactions you did on behalf of Romex with Candor, and throwing in the business you did for your nephews in Achim, you got approximately $800,000 worth of goods delivered to Candor; is that correct?
A: No, more. $455 and 550 is more than 8 hundred. It is about a million.
Examination of Ry Diamond Co., November 18, 1982 at pages 8 and 19.

**16.** Rule 11 is applicable here because Rosenberg's affirmation, upon which we rely in imposing sanctions, was signed by him on behalf of himself and the Rosenberg Entities as the rule requires. Further, his affirmation is embraced by the rule inasmuch as rule 11 includes the phrase "other paper." That phrase was adopted in the 1983 amendment and applies here because Rosenberg's affirmation was signed in 1986.

mindful that the rule was not intended to chill one's creativity or enthusiasm in pursuing factual or legal theories. *See* Advisory Committee Notes on Fed.R.Civ.P. 11; *Eastway*, 762 F.2d at 254; *In re Food Workshop*, 70 B.R. 962, 967 n. 4 (Bankr.S. D.N.Y.1987). Nor can we say that the imposition of the statute of limitations as a defense in the answer runs afoul of Rule 11 because a hiatus in the litigation did occur before the Trustee amended his complaint.

■ But the continued assertion of the statute of limitations defense in the opposition to the summary judgment motion after discovery was taken does run afoul of Rule 11. *See, e.g., Azuma N.V. v. Sinks*, 646 F.Supp. 122, 128 (S.D.N.Y.1986); *Armada Supply, Inc. v. S/T Agios Nikolas*, 613 F.Supp. 1459, 1467 (S.D.N.Y.1985). Notwithstanding that the defendants uncovered nothing indicating that the Trustee prior to issuance of the Information had acquired actual knowledge of the fraud or sufficient facts to put him on notice, the defendants did not withdraw this defense, but asserted through Rosenberg's affirmation, without support, that tolling should not apply.[17] *See* part III(B)(1) *supra.* Thus, an award of attorney's fees and ex-

---

17. The defendants' argument that the Trustee should have been alerted to a possible fraud by virtue of the size and close timing of the transfers is rebutted by Rosenberg's own testimony; when the Trustee's counsel questioned Rosenberg as to whether these sales were unusual, he repeatedly assured counsel that they were not.

Q: Is that unusual for you in your business to do $1 million worth of business with one customer?
A: No, I don't think so, no.
Q: Do you have other customers that are $1 million customers of yours?
A: At the moment I don't. Then I might have had.
Q: That being in 1981?
A: 1980.
It does happen that occasionally I get a customer that buys a lot of goods.
I never added up the transactions, but large amounts like this.
Q: As you started to pick up the volume of business with Candor through April, May, June, were you surprised by the amount that he was buying from you?
A: No, because I wasn't surprised because I saw that he was buying a large variety of selection, and the way I saw it he was filling in exactly what a normal manufacturer would need.
Q: When you say, "a large variety of selection," what do you mean?
A: Quarters, small goods, and larger goods, half karats and karats which was the normal way whether they buy for $1 million or $100,-000, somebody who has a big spread of commercial goods would buy.
Q: Did it appear to you that the purchases were consistent with the type of business that Candor was in?
A: That was presenting to have.
Q: Just to ask you again. As the volume of business mounted, did you ever make inquiries of any of the diamond community about the business credit of Candor?
A: No. Maybe off the cuff, but not to go around asking.

The only time I do that is when somebody owes me money and he wants to borrow more, at that time I go around asking, "What do you think about this man?" Otherwise I wouldn't go asking. I wouldn't want to tell too many people that they should take away such a good customer from me.
Examination of Ry Diamond Co., November 18, 1982 at pages 19–21.
Q: So that within the space of a few days you had delivered over $350,000 worth of diamonds to Margolies?
A: Right.
Q: Did that surprise you?
A: No, because I saw the way he was operating. I saw that he is—the place was always very, very busy, there was a lot of people working there and he was always very busy and hard to get on the phone.
He called I should be there exactly this time. He was very careful of what he bought. He looked over goods and maybe would decide two days later to buy them.
Could be he looked at those goods on the 13th and called me back on the 15th that he would take the goods. I don't remember exactly the way it the [sic] happened. He was very interested.
He said he needed a lot of goods on July. I was going to go away on vacation in July. I felt—my assumption was that somebody else that was supplying him before, he found me as a better supplier, that's what my assumption was.
Q: And that that was why there was such a sudden jump in the volume?
A: Yes. I did treat him right. I never overcharged him. Even if I wanted to overcharge him I couldn't. So we were doing—
Q: Why couldn't you have overcharged him?
Q: Because he was interested in the goods and he looked at the goods and fighting over every penny.
Deposition of Romex Diamond Corp., November 18, 1982 at pages 26–28.

**356**

penses reasonably incurred in preparing a response to the statute of limitations argument in the defendants' affirmation and memorandum of law is appropriate.

 We do not award fees incurred in connection with defendants' earlier challenge to the constitutionality of this court. At the time that defense was pleaded, the jurisdiction of the court was much debated. Defendants withdrew the defense when they believed that the issue had been resolved in the courts.

## CONCLUSION

Accordingly, we grant the Trustee's motion for partial summary judgment against Rosenberg in the amount of $446,301.96 plus interest less the sum of $180,000 already recovered by the estate less any restitution payments Rosenberg has made to the estate in accordance with his sentencing on the bankruptcy fraud conviction. We are unable to tell from the record whether the $180,000 recovered is an appropriate offset against the liability of Romex and Ry. We are also unable to determine the amount of the transfers to Romex and Ry, although we can infer from the invoices and the Memorandum how the monies were probably divided. Accordingly, we are prepared to enter summary judgment as to the liability of Romex and Ry but will require a trial as to the amounts which each owes to the Trustee. Reasonable attorneys' fees and costs will be awarded for those matters described above upon proper application by the Trustee on notice to the defendants unless the parties can agree on reasonable awards.

SETTLE ORDER in accordance with this opinion.