granted to seek a stay pending appeal from the district court.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Debtor's Emergency Motion for Stay Pending Appeal of this Court's Findings of Fact, Conclusions of Law and Memorandum Opinion and Order dated August 26, 2005, and Final Judgment dated September 14, 2005 be, and the same is hereby, denied without prejudice subject to the conditions outlined above. It is further

ORDERED, ADJUDGED AND DE-CREED that the effect of the Final Judgment be, and the same is hereby, stayed for ten (10) days. If the Debtor seeks a stay pending appeal from the district court, the stay shall continue until the district court enters a decision. If the Debtor does not seek a stay pending appeal, it shall vacate the premises within twenty (20) days after the expiration of the initial ten (10) day stay.

In re J & D SCIENCES, INC., Debtor.

**V. John Brook, Trustee, Plaintiff,**

v.

**Alphamed Pharmaceuticals Corp., Defendant.**

**Bankruptcy No. 8:02 BK 00342 KRM.**
**Adversary No. 8:04 AP 00517 KRM.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 3, 2006.

Paul Orshan, Miami, FL, for Defendant.

## MEMORANDUM OPINION REGARDING AVOIDANCE OF FRAUDULENT TRANSFER

K. RODNEY MAY, Bankruptcy Judge.

In April 2001, less than a year before filing for relief under Chapter 11, the debtor executed, and recorded with the U.S. Patent and Trademark Office ("USPTO"), an assignment of a valuable biotech patent (Patent # 6174859, which is described in more detail below and referred to as the "Patent"). The Patent was assigned to an insider, Alphamed Pharmaceuticals, Inc. ("Alphamed").[1] The debtor received no consideration for the assignment.

Ordinarily, this would be sufficient for the Chapter 7 trustee to avoid the assignment of the Patent, as a fraudulent transfer under Bankruptcy Code Section 548(a)(1)(B).[2] Alphamed maintains that the trustee's avoidance action is time-barred because it was filed more than two years after the trustee's appointment.[3] Alphamed also contends that it actually owned the Patent for more than two years before the assignment was recorded.

After considering the witnesses' testimony and the documentary evidence, and for the reasons stated below and on the record in open court, the Court concludes that: (1) because the existence of the Patent and the debtor's assignment to Alphamed were affirmatively concealed from the trustee, the doctrine of equitable tolling applies to allow the trustee to pursue this late-filed avoidance action; and (2) the assignment of the Patent is avoidable because the transfer was not perfected until the written assignment to Alphamed was recorded with the USPTO, nine months before the bankruptcy filing.

## BACKGROUND

### The Lezdey–Wachter Conflict

This adversary proceeding arises in the midst of a long-standing conflict between

---

1. The parties stipulated that Alphamed is an insider, that the Patent is worth much more than the consideration paid, and that the debtor was insolvent when the assignment was recorded.

2. The Trustee's complaint sought relief under 11 U.S.C. §§ 548(a)(1)(A) and (B), as well as Section 726.105(1)(b), Florida Statutes.

3. 11 U.S.C. Section 546(a)(1). This case began as a Chapter 11 on January 8, 2002. On April 23, 2002, the case was converted to a Chapter 7. The date to file avoidance actions expired two years later, on April 22, 2004.

John Lezdey, the president and principal shareholder of the debtor, and his former business partner, Allan Wachter, M.D. For more than five years, the Lezdey family has been in litigation with Dr. Wachter and his affiliated entities over the ownership and control of certain biotech companies, business ventures, and patents.

John Lezdey is a research chemist and patent lawyer. In 1997, he and Dr. Wachter co-founded AlphaOne Pharmaceuticals, Inc., now known as Arriva Pharmaceuticals, Inc. ("Arriva"), which is now controlled by Dr. Wachter. Through their other companies, Lezdey and Wachter formed a joint venture, Sonoran Desert Chemicals LLC ("Sonoran"), to own the parties' respective biotech patents.[4] They also formed Protease Sciences, Inc. ("PSI"), as a subsidiary of Sonoran, to act as a licensing agent for the Sonoran patents. At one time, John Lezdey's sons, Darren and Jarett, who control the operations of defendant Alphamed, were actively involved in Arriva and PSI.

Around 1999, a business dispute erupted between the Lezdeys and Dr. Wachter. The Lezdeys left Arriva and the litigation began. Currently, there are lawsuits pending in Arizona state court, the United States District Courts in the Northern District of California and the Southern District of Florida, and the Circuit Court in Pinellas County, Florida.

In the Arizona state court case, Dr. Wachter and two of his companies (Seth Chemicals, Inc., and Nathan Technologies, Inc.) filed claims against John Lezdey, his sons Darren and Jarett, and the debtor, accusing them, among other things, of breach of fiduciary duty in the jointly-held businesses, Sonoran and PSI. In February 2002, Dr. Wachter and his entities obtained a $17.8 million judgment against Darren and Jarett Lezdey.[5]

*The Bankruptcy Case*

Although the debtor was a defendant in the Arizona case, the trial and entry of any judgment against it was stayed by its filing a petition for relief under Chapter 11 on January 8, 2002. The debtor's petition, schedules, and statement of financial affairs were executed by John Lezdey, as debtor's president. He also appeared for the debtor at the initial Section 341 creditors' meeting.

The debtor had no business operations or income. The original schedules show only nominal assets, including (a) a 1% interest in JL Technology and (b) three pending patent applications, collectively valued at "$0.00." The undisclosed Patent was the debtor's single most valuable asset. The case was converted to Chapter 7 on April 23, 2002, and the plaintiff was appointed trustee.

The debtor's schedules list five creditors with claims totaling $10,150,000.00; only three claims were actually filed. The larg-

4. John Lezdey and his wife, Noreen, own the stock of the debtor and a Nevada limited partnership, JL Technologies, which owns 50% of Sonoran. Dr. Wachter owns Seth Chemicals, Inc., and Nathan Technologies, Inc., which owns the other 50% of Sonoran.

5. John Lezdey initially avoided trial in Arizona by filing a petition for relief under Chapter 13 in this Court on January 14, 2002 (Case No. 8:02–bk–00626–TEB). That case was dismissed on April 28, 2004. He filed a second Chapter 13 case on June 13, 2005 (Case No.

8:05–bk–11884–KRM); but the automatic stay was lifted, on June 15, 2005, to allow Dr. Wachter to proceed against Mr. Lezdey in the pending Arizona case. On April 29, 2005, Jarett and Darren Lezdey filed petitions for relief under Chapter 11 (Case Nos. 05–8711 and 05–8716 respectively). On October 18, 2005, this Court entered an order dismissing their Chapter 11 cases. *See In re Lezdey*, 332 B.R. 217 (Bankr.M.D.Fla.2005). Their cases were converted to Chapter 7, however, before the dismissals became effective.

est is Dr. Wachter's claim of $17.8 million, based on the same alleged damages that resulted in the Arizona judgment against Darren and Jarett Lezdey. Arriva filed an "unliquidated" claim for the damages that it was asserting in the lawsuit pending in the Northern District of California.

### The Patent

John and Darren Lezdey applied for a process patent in April 1999, for a method of manufacturing alpha-1 antitrypsin ("AAT") using recombinant yeast cultures.[6] In September 2000, the USPTO notified John Lezdey that the Patent had been allowed, thus requiring payment of an issuance fee. Mr. Lezdey submitted the payment with a signed transmittal form noting, in his handwriting, that the *debtor* was the assignee of the Patent. In January 2001, the Patent—United States Patent # 6174859—was issued in the name of *"J & D Sciences, Inc."*

On April 10, 2001, John Lezdey prepared and executed on behalf of the debtor a written assignment of the Patent to Alphamed for the recited consideration of $1.00. The assignment was recorded with the USPTO on the same day, only nine months before the debtor filed its Chapter 11 petition.

From the time of its formation in July 1999, Alphamed operated as if it had an interest in the Patent: it listed the Patent among its intellectual property assets; its principal investor based his investment on Alphamed's development of the Patent; Alphamed paid most of the expenses related to maintenance and development of the Patent; and its business plan for 2000 refers to the Patent and its uses. It is undisputed, however, that prior to April 10, 2001, there was no written document purporting to convey any interest in the Patent to Alphamed.

### The Trustee's Investigation

The trustee and his counsel interviewed John Lezdey at the Section 341 creditors' meeting on May 23, 2002. Item 10 of the debtor's statement of financial affairs, signed by John Lezdey under penalty of perjury, lists no transfers of assets within the year prior to the Chapter 11 filing. The trustee testified that he was not told of the Patent assignment even though he routinely asks debtors about pre-petition transfers (the tape recording of the meeting is no longer available).

Trustee's counsel later met with Darren and Jarett Lezdey to discuss the debtor's assets and financial affairs. They provided him with tax records, which showed no evidence of any assets or business activity. They did not disclose the assignment of the Patent to Alphamed. The trustee testified that the Lezdeys were asked to produce all agreements relating to the debtor and for all financial statements and documents reflecting any assets owned by the debtor; the trustee received no information regarding the assignment of the Patent.

The Lezdeys did later advise the trustee of a potential recovery in the amount of $100,000 which was not listed on the schedules; but the trustee found no basis for a recoverable claim. Instead, he offered to sell all of the debtor's listed assets, including this alleged claim, to the Lezdeys; they declined to offer anything. On or about February 25, 2004, these assets were sold to Arriva for $2,500. Until then, the estate had no cash.

---

6. AAT is a protein produced naturally in the liver. The Patent involves a process for the use of synthetically manufactured AAT, which is thought to have a variety of medical applications, including the treatment of ear and eye inflammations, emphysema and other diseases.

The trustee did receive from debtor's counsel a one-page handwritten organizational "flow" chart (Trustee's Exh. 13), which listed the Wachter and Lezdey entities and the joint ventures that they had formed. Among other things, this chart refers to *"Sonoran"* with the note *"owns all patents (took by assignment from J & D and Seth)."*

The trustee also made handwritten notes on his copy of the debtor's schedules, including the note *"Swedish application came up in search."* The notes could have been made in response to a subject covered at the creditors' meeting in May 2002. The trustee does not recall what that referred to or when the notes were made.[7]

*The Avoidance Action*

The two-year deadline for filing avoidance actions expired on April 22, 2004 (the "Avoidance Deadline"). It is undisputed that the *trustee* did not know about the Patent or its assignment to Alphamed until about July 2, 2004, when Arriva's attorney sent trustee's counsel a copy of the USPTO notice of the recorded assignment. Arriva's attorneys then prepared a draft complaint and sent it to trustee's counsel on August 24, 2004. Trustee's counsel made some minor revisions and filed the avoidance action on September 1, 2004, more than four months after the Avoidance Deadline.

## DISCUSSION

*Limitations Period Under Section 546(a)*

■ The limitations period in Section 546(a)(1) is a true statute of limitations. *Pugh v. Brook, (In re Pugh),* 158 F.3d 530 (11th Cir.1998). The deadline in Section 546(a)(1) is therefore subject to the doctrines of waiver, equitable tolling and equitable estoppel. *IBT International, Inc. v. Northern, (In re Int'l Administrative Services Inc.),* 408 F.3d 689, 699, (11th Cir. 2005).

■ In the case of fraud, or in this case a fraudulent transfer, application of the principle of equitable tolling requires the trustee to prove that: (1) the alleged fraud was concealed by affirmative acts or misrepresentations by any of the parties involved; or (2) if the fraud was not affirmatively concealed, it went undiscovered in spite of the trustee's due diligence to discover the fraud. *Id.* at 701. The equitable tolling doctrine is based on the principle that equity does not lend itself to fraud of any kind. *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).

■ There is no doubt that the existence of the Patent and its assignment to Alphamed were affirmatively concealed from the trustee. Alphamed is controlled and operated by the sons of the debtor's president, who, as a patent lawyer, handled the application for the Patent and its assignment to Alphamed. John Lezdey signed the debtor's statement of financial affairs and testified at the Section 341 creditors' meeting. The debtor and its president, John Lezdey, had an affirmative obligation to disclose any transfer within the year prior to filing.

Even though the Patent and the assignment were matters of public record, and apparently could have been found by a computer search, the debtor's statement of financial affairs and Mr. Lezdey's testimony misled the trustee, who then reasonably concluded that there were no additional

---

7. Much was made at trial about conflicting testimony regarding when these notes were made by the trustee. It appears that something was said at the creditors' meeting about a "Swedish application;" but, the record is not clear as to the nature of this discussion or the significance of the disclosure of a "Swedish application."

assets or transfers to recover for the estate.[8] In turn, the trustee did not conduct any search of the USPTO database.

It was entirely reasonable for the trustee to rely on the debtor's statement of financial affairs and the representations made by Mr. Lezdey under oath at the creditors' meeting. Moreover, for nearly two years the estate had no cash. In the absence of any indication of potential avoidance actions, the trustee had no reason to conduct any additional investigation or searches of public records, including USPTO filings.

The Court adopts the analysis set forth in *In re Levy*, 185 B.R. 378 (Bankr. S.D.Fla.1995), holding that the limitations period would be equitably tolled to permit the trustee to avoid, as a preferential transfer, the debtor's undisclosed pre-petition conveyance of a condominium to an insider.

> As previously noted, the Debtor failed to reflect, in his answer to Question 12 of his Statement of Financial Affairs, that he had made a transfer of his interest in the condominium unit within one year prior to his bankruptcy filing. It is wholly unrealistic to expect a bankruptcy trustee, in the ordinary course of the performance of his duties, to conduct a title search. It has only been with the recent amendment to the Bankruptcy Code and related statutes that the minimum per case compensation paid to a trustee has increased from $45.00 to $60.00. Performance of a real property search in every case, as suggested by the Defendant, would render service as a chapter 7 panel trustee economically implausible. Rather, a bankruptcy trustee has a right to rely upon the sworn schedules and statements filed by a

debtor at the commencement of a bankruptcy case, and such reliance should not preclude a trustee from seeking recovery of a possible asset, the existence of which is not revealed until the expiration of the two-year limitations period under 11 U.S.C. § 546.

*Id.* at 386.

■ In the present case, there was an affirmative concealment of the transfer by the debtor's failure to discharge its legal obligation to disclose all transfers out of the ordinary course of business within one year before bankruptcy. That fact alone renders irrelevant any evaluation of the trustee's due diligence. *IBT International, Inc. v. Northern (In re Int'l. Admin. Servs., Inc.)*, 408 F.3d at 701. Nevertheless, the Court concludes that the trustee's inquiry was entirely reasonable and diligent in the face of the statement of financial affairs, the schedules, the testimony given at the creditors' meeting, and the lack of funds in the estate.

It is disingenuous for Alphamed to assert that the trustee should have done more. This contention by Alphamed— owned and controlled by the Lezdey family—is equivalent to saying that the trustee should have put forth more of an effort to discover the transaction that the Lezdeys elected not to disclose to him. This is the very situation that the doctrine of equitable tolling is intended to address: "equity will not lend itself to fraud of any kind." *Holmberg v. Armbrecht*, 327 U.S. at 396, 66 S.Ct. at 584.

■ In *In re Naturally Beautiful Nails, Inc.*, 243 B.R. 827 (Bankr.M.D.Fla. 1999), a Chapter 11 debtor brought a fraudulent transfer action more than three

---

8. The trustee and his counsel, experienced bankruptcy professionals, do not routinely research patents or the USPTO database.

years after the petition was filed. The standard articulated in that case for applying the doctrine of equitable tolling applies in this case as well: "the statute does not begin to run until 'the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence *after being apprised of sufficient facts to put him on notice.*'" *Id.* at 829 (emphasis added) (quoting *In re Candor Diamond Corp.,* 76 B.R. 342, 350 (Bankr.S.D.N.Y.1987)).

■ The Court rejects Alphamed's contention that the trustee was put on "inquiry notice" by the various fragments of information he was given during the course of his investigation, namely: (1) the one-page flow chart referring to the Sonoran patents; and (2) the indication, from the trustee's notes, that he was told something about a search regarding a "Swedish application." These cryptic tidbits are wholly insufficient to have led the trustee to conclude that he should search the USPTO records. They are inadequate to overcome the trustee's reasonable reliance on the debtor's affirmative misrepresentation that there had been "no transfers" within the year before bankruptcy.

■ The Court also rejects Alphamed's argument that Arriva's knowledge of the assignment of the Patent prior to the Avoidance Deadline should be imputed to the trustee. Arriva may hold 99% of the claims in this case and Arriva did know about the assignment of the Patent prior to the Avoidance Deadline. But this line of argument is a red herring.

9. It is also irrelevant that Arriva may hold 99% of the claims in this case. First, its claim is still subject to objection and may, at some point, be disallowed. Second, there is no rational basis for drawing a line as to the size of a knowing creditor's claim: would the same argument for imputing knowledge apply

■ The doctrine of equitable tolling rests on the principle that equity will not tolerate a party to benefit from a statute of limitations where the facts underlying the cause of action have been affirmatively concealed from the plaintiff. It is irrelevant that some other person, in this case a creditor, may have knowledge of the facts.[9]

In addition, the avoidance action under Section 548(a)(1) is inherent to the powers of the trustee. The trustee is a disinterested person, without any affiliation to Arriva. The trustee did not engage in any inequitable conduct. There is no authority cited for the proposition that a creditor's knowledge of a claim must be imputed to the trustee.

*Fraudulent Transfer—Section 548(a)(1)(A).*

■ To avoid the assignment for actual fraud, under Bankruptcy Code Section 548(a)(1)(A), the trustee must prove that the transfer was made with the actual intent to hinder, delay, or defraud creditors. The Court concludes that the trustee did not prove that the assignment was made with the actual intent to hinder, delay or defraud Arriva, Wachter or any other creditor.[10]

*Fraudulent Transfer—Section 548(a)(1)(B)*

■ To avoid the assignment as a constructive fraud, under Bankruptcy Code Section 548(a)(1)(B), the trustee must prove that: (1) the debtor owned the Patent; (2) the transfer occurred within one year of the debtor's petition date; (3)

to a creditor holding 75% of the claims? Fifty-one percent? One percent?

10. The record supports the conclusion that the assignment was made primarily to satisfy the requirements of Alphamed's potential investors or lenders.

the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the debtor received less than a reasonably equivalent value in exchange for the transfer. *In re XYZ Options, Inc.,* 154 F.3d 1262, 1275 (11th Cir.1998).[11] Alphamed has stipulated to all of these elements, except as to when the transfer occurred. For the reasons stated below, the court concludes that the Patent was transferred on the date it was recorded, within the one-year reachback period.

For purposes of avoidance, Section 548(a) provides that the date of the transfer is:

> When such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee.

11 U.S.C. § 548(d)(1).

With regard to a patent, federal law, 35 U.S.C. Section 261, provides that an assignment:

> Shall be void as against any subsequent purchaser ... for a valuable consideration without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase....

[13] Therefore, as a matter of law, a transfer (i.e., assignment) of a patent is not perfected against a bona fide purchaser until it is recorded with the USPTO. In this case the date of recording with the USPTO, April 10, 2001, was within the one-year reachback period.

[14] Further, the record does not support Alphamed's contention that it has owned the Patent since 1999. In September 2000, John Lezdey designated the debtor as the assignee of the Patent. The Patent was issued to the debtor, not Alphamed, in January 2001. The written assignment prepared and signed by John Lezdey, dated April 10, 2001, states that: (1) the *debtor is the owner* of the Patent; (2) Alphamed *desires to acquire* the Patent; (3) the "full and exclusive right, title and interest" in the Patent *is being conveyed* to Alphamed; and (4) the assignment *supersedes any previous assignment or equivalent agreement.*

 Alphamed's efforts to maintain and develop the Patent do not constitute actual ownership. The Lezdeys may have intended that Alphamed would own the Patent one day. The Court finds, however, that the debtor had full ownership rights in the Patent until April 10, 2001, when the assignment to Alphamed was executed and recorded.

### CONCLUSION

Less than a year before filing for relief under Chapter 11, the debtor executed and recorded its assignment of the Patent to Alphamed. Alphamed is an insider and gave no consideration for the assignment. Because the existence of the Patent and the debtor's assignment to Alphamed were affirmatively concealed from the trustee, the doctrine of equitable tolling applies to allow the trustee to pursue this late-filed avoidance action. The transfer was perfected when the written assignment to Alphamed was recorded with the USPTO, nine months before the bankruptcy filing. Therefore, the trustee has proven all of the elements to avoid the assignment of the Patent.

---

**11.** Section 726.105(1)(b) provides another basis for a trustee to avoid a transfer. The statutory law is nearly identical to Section 548(a)(1)(B), and therefore, the same analysis applies. *In re Stewart,* 280 B.R. 268 (Bankr. M.D.Fla.2002).

The Court will enter its final judgment by separate order entered contemporaneously herein.

DONE and ORDERED in Tampa, Florida, this *3rd* day of January, 2006.