**In re Jason E. ANDERSON, Erica L. Anderson, Debtors.**

**Ruth A. Slone, Chapter 7 Trustee, Plaintiff**

**v.**

**Jason E. Anderson, et al., Defendants.**

**Bankruptcy No. 10–30064.**
**Adversary No. 10–3361.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
At Dayton.

Signed Sept. 9, 2013.

Entered Sept. 10, 2013.

Lee A. Slone, Ruth A. Slone, Dayton, OH, for Plaintiff.

Jason E. Anderson, pro se.

Erica L. Anderson, pro se.

Tyler W. Kahler, Canton, OH, for Defendants.

LAWRENCE S. WALTER, Bankruptcy Judge.

**DECISION OF THE COURT:**

1) DISMISSING ALL CAUSES OF ACTION AGAINST DEBTORS JASON AND ERICA ANDERSON;

2) AVOIDING TRANSFER OF $74,102.60 TO 1ST NATIONAL CASH REFUND, INC. AS AN UNAUTHORIZED POST–PETITION TRANSFER PURSUANT TO 11 U.S.C. § 549 AND ORDERING RECOVERY OF TRANSFERRED PROPERTY FROM 1ST NATIONAL PURSUANT TO 11 U.S.C. § 550; AND

3) HOLDING CARL WOODFORD JOINTLY LIABLE FOR RECOVERY OF $62,009.00 AS AN IMMEDIATE TRANSFEREE PURSUANT TO 11 U.S.C. § 550

*SUMMARY*

As set forth in great detail below, the court, following trial, has made the following determinations: All of the Trustee's claims against the Debtors are dismissed. The Debtors' transfer of $74,102.60 of estate property to Defendant 1st National

Cash Refund, Inc. is avoided under 11 U.S.C. § 549 as an unauthorized post-petition transfer. The Trustee is entitled to recover $74,102.60 from 1st National Cash Refund, Inc. as the initial transferee pursuant to 11 U.S.C. § 550(a)(1). Furthermore, Defendant Carl Woodford is jointly and severally liable to the Trustee for the $62,009.00 he withdrew from 1st National Cash Refund Inc.'s account on September 3, 2010 as an immediate transferee pursuant to 11 U.S.C. § 550(a)(2).

## INTRODUCTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the standing General Order of Reference in this District.

This matter is before the court on the Second Amended Complaint [Adv. Doc. 75] filed by Plaintiff Ruth A. Slone, Chapter 7 Trustee ("Trustee") seeking recovery of property of the estate or avoidance of a post-petition transfer among other claims. The complaint was filed against the alleged transferors, Debtor–Defendants Jason and Erica Anderson ("Debtors") and the alleged transferees / holders of the property, Defendants 1st National Cash Refund, Inc. ("1st National") and Carl Woodford ("Woodford").

The Trustee alleges that, after their bankruptcy filing and discharge, the Debtors hired 1st National to recover $74,102.60 in proceeds being held by the Common Pleas Court of Delaware County, Ohio ("Delaware County Court") resulting from a pre-petition foreclosure and sale of real property owned by the Debtors. The Trustee alleges that those proceeds were property of the Debtors' estate and were not disclosed by the Debtors on their schedules or at any time prior to their discharge and the closure of their case. The Trustee asserts that the proceeds and/or damages are recoverable from the Debtors and/or 1st National under theories of turnover of property of the estate pursuant to 11 U.S.C. § 542; a violation of the automatic stay pursuant to 11 U.S.C. § 362; conversion; or as an unauthorized post-petition transfer pursuant to 11 U.S.C. § 549. Furthermore, the Trustee asserts that the corporate veil can be pierced so that both 1st National and Woodford, who allegedly controlled 1st National, are liable as transferees.

The matter proceeded to trial on March 26, 2013. The court has carefully considered and weighed the testimony of the witnesses present at the trial as well as the exhibits admitted into evidence. The following decision constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## FINDINGS OF FACT

### A. Debtors' Bankruptcy Case and the Undisclosed Foreclosure Proceeds

On January 8, 2010, Debtors filed a joint Chapter 7 bankruptcy petition and schedules. They listed as assets in their schedules neither real property nor proceeds from the sale of real property. However, in their Statement of Financial Affairs, Debtors noted a Delaware County, Ohio foreclosure action ("foreclosure action") on a condo that the Debtors had owned located at 562 Spring Valley Drive in Lewis Center, Ohio (the "condo"). The Debtors stated that the status or disposition of the foreclosure action was "Judgment—Sold at Sheriff Sale" [Bankr.Case No. 10–30061, Doc. 1, p. 34]. No mention is made of any equity in the property or proceeds owed to the Debtors from this sale. However, in Schedule F, the Debtors list a mortgage creditor, Litton Loan Servicing, owed a deficiency balance of $37,113.00 on the condo.

The Debtors' § 341 meeting of creditors was held on March 3, 2010. At the meeting, the Trustee asked the Debtors if they had listed all of their assets in their bankruptcy petition and schedules. They answered that they had. The Trustee further questioned whether the Debtors were owed any money. The Debtors said no. The Trustee specifically asked them about the foreclosure action listed in their Statement of Financial Affairs. The Debtors said that the foreclosure was completed and that there was no money owed to them or proceeds due from anybody.

On or about February 10, 2010, the Trustee received a proposed agreed order from Hidden Springs Condominium Association requesting that the Trustee agree to relief from the automatic stay in connection with the foreclosure action. The Trustee signed the agreed order that was then entered by the court on March 10, 2010. The order granted the condo association relief from the stay to continue final post-judgment proceedings related to the foreclosure including completing the confirmation of the sheriff sale of the condo that had occurred on September 16, 2009. The Trustee did not abandon the condo property. The Trustee testified at the hearing that she routinely signs such relief from stay requests because they allow the foreclosure to continue without releasing any of the Trustee's rights. She also testified that the request from the condo association did not alert her to the fact that there remained any surplus funds after the foreclosure and sale.

At no point during the Debtors' bankruptcy case did the Trustee review the Delaware County Court's foreclosure docket. The Trustee testified that she did not review the docket because both the Debtors' schedules and statements at the § 341 meeting indicated that there was no money owing to them from the foreclosure. The Trustee further testified that it was not within the normal course of her duties to check a foreclosure docket in such circumstances.[1] The Trustee said that she received no alert that the schedules were inaccurate or any other indication that would suggest the need to review the foreclosure docket.

What the Trustee would have found upon review was a Judgment Entry of Confirmation and Order of Distribution [Pl.Ex. 12] entered by the Delaware County Court on December 8, 2009, and consequently, on the docket before the Debtors' bankruptcy case was filed. The order stated that the condo had been sold and that the mortgage liens were deemed satisfied [Id.]. The order provided a list of how the proceeds were to be distributed including funds to be disbursed to the appraiser and sheriff, real estate taxing authority, and the condo association [Id.]. Significantly, the order noted a remaining balance of $74,343.23 that was to be held by the court until further order [Id.]. This remaining balance of proceeds from the sale of the condo was apparently a result of a default in the foreclosure action by the mortgage lien holder MERS or Deutsche Bank National Trust Company ("Deutsche

1. At the hearing, the Trustee called a local Chapter 7 Panel Trustee, Don Harker, to testify as to the normal and customary duties of a trustee including what kind of suspicious information would trigger a search beyond the schedules for undisclosed assets [Transcript of March 26, 2013 Hearing ("Tr.") pp. 47–56]. However, the Trustee decided not to qualify Harker as an expert [Tr. pp. 51–52]. Furthermore, Harker has no personal knowledge of or involvement in the Debtors' bankruptcy case [Tr. p. 56] necessary to be a lay witness. Because he was not qualified as an expert witness and does not qualify as a lay witness, the court will not consider Harker's testimony in rendering its determinations.

Bank")[2] which failed to file an answer [Transcript of March 26, 2013 Hearing ("Tr.") pp. 63–64]. A nunc pro tunc Judgment Entry was subsequently entered on April 28, 2010, which, again, provided a list of how the proceeds were to be distributed with a total of $74,102.60 remaining and to be held by the court until further order [Pl.Ex. 14]. The Debtors testified that they had no idea that there was $74,102.60 remaining after the foreclosure sale.

After the § 341 meeting and without review of the foreclosure docket, the Trustee concluded that there were no assets to distribute to creditors and filed a report of no distribution. The Debtors received their discharge on May 11, 2010 and the case was closed on May 26, 2010.

## B. 1st National/Carl Woodford and the Discovery of the Foreclosure Proceeds

Following the Debtors' discharge, the foreclosure funds remained with the Delaware County Clerk of Courts until the funds were discovered by Woodford of 1st National. According to Woodford's testimony, 1st National was incorporated in Ohio in 2001 and is a "professional locator firm" [Tr. p. 127]. 1st National is in the business of searching for missing and outstanding funds throughout the country and helping return those funds to their rightful owners whether companies or individuals.

Woodford is the President, CEO, statutory agent, and one of two shareholders (his wife is the other) of 1st National. In addition to his work for 1st National, Woodford, who holds a bachelor's degree in business management, is also general manager of Woodford Contemporary Real Estate. Woodford has thirty years of experience in real estate including investing, working as an agent, working in televised real estate educational programs as well as researching foreclosure cases. In fact, Woodford testified that while foreclosure cases can be tricky and complex, he had the experience necessary to have a clear understanding of them [Tr. p. 166].

First National has no employees. Besides some part-time assistants hired from time to time and paid on commission, Woodford operates the business by himself. Only Woodford writes checks and deposits funds for the company. His wife, the other shareholder, has no part in the day to day operation of the business. Woodford cannot recall the last time 1st National held a shareholder meeting. Neither 1st National nor Woodford filed tax returns for the year 2010 and 1st National has not issued a W–2 and 1099 for the part-time help in a number of years. In the past, Woodford has used 1st National interchangeably with other business that Woodford engages in including real estate investments using funds from private investors [Tr. p. 190]. However, the current recession has been "brutal" to Woodford and 1st National's real estate business. Woodford indicated that 1st National is practically defunct and that both he and 1st National may be contemplating bankruptcy in the near future [Tr. pp. 191, 203].

In order to locate funds, Woodford typically contacts county courts and treasurers' offices to obtain lists of all the funds currently being held by them. Sometimes those lists may be researched on the Internet, but often the research requires travel to various local offices to make a written request. Sometimes the offices charge a fee and sometimes the searches are free. Once funds are identified, Woodford attempts to determine to whom the funds are owed and contacts the entity, whether

---

**2.** The mortgage was assigned from MERS, acting as nominee for the Residential Finance Corporation, to Deutsche Bank National Trust Company in August of 2009 [Tr. pp. 74–75].

an individual or corporation, about the discovery. Woodford sends the entity a contract to allow Woodford to assist in the recovery. If a contract is signed, then Woodford lets the entity know the source of the funds.

In the case of the Debtors, Woodford determined that funds were remaining in the foreclosure action after requesting from the Delaware County Court an open items report that lists all funds available from mortgage and tax foreclosure cases. Upon discovering the remaining funds in the Debtors' case, Woodford asked one of the attorneys he routinely hires, John G. Neal ("Attorney Neal"), to look at the case and determine who was owed the funds. Both Woodford and Attorney Neal knew from documents on record in the foreclosure action that the Debtors had filed a bankruptcy case. However, because the Debtors' bankruptcy case was closed, they came to the conclusion that it was the Debtors, and not a bank or the bankruptcy trustee, who were owed the surplus funds. Woodford testified that if Attorney Neal had determined that the bankruptcy trustee was owed the money, Woodford would have contacted her. Woodford testified that he had worked with bankruptcy trustees in the past and had no issues recovering a fee from them [Tr. pp. 185–86].

As it was, Woodford determined that the Debtors were the ones to contact and Woodford's attempts to contact the Debtors began in earnest. His first attempt was likely a June or July, 2010 phone call to Debtor Erica Anderson at her work place to tell her about the money. She was suspicious and "put him off" by saying that she needed to talk to her husband [Tr.

pp. 109, 148]. He continued to call and the Debtors began avoiding his calls believing that it was not true.

Woodford followed up with a July 29, 2010 letter [Pl.Ex. 1] after finding the Debtors' address using an Internet search engine. In that letter, Woodford identified himself as President and CEO of 1st National Cash Refund, Inc., specializing in the recovery of assets. Woodford explained that through his company's investigations, he had discovered $74,102.60 in funds due to the Debtors and that his company would assist in the recovery of the funds for a fee of between 35% and 45% of the recovery. According to Debtors' testimony, they did not recall reading the letter and likely discarded it as junk mail.

Woodford then attempted to contact the Debtors in person. In early August, he arrived at the Debtors' residence uninvited and the Debtors' son answered the door. The Debtors felt that Woodford was an intimidating figure.[3] Debtor Jason Anderson testified that Woodford was a lot bigger than himself leading the Debtor to stop by the garage and put a screwdriver in his pocket as a weapon if needed. However, upon talking with Woodford, the Debtors grew more comfortable and believed he was a nice guy. Consequently, they let him into the residence. At that point, Woodford explained that he discovered money owed to the Debtors, but he could not tell them the source of the funds until they signed an agreement. Woodford went over the particulars of the agreement with the Debtors including that 1st National would be authorized to retain an attorney at no cost to the Debtors in

---

**3.** Woodford testified that, at a weight of 300 pounds, he is an imposing figure and tries hard to explain himself and his business when he arrives at people's homes unannounced. He explained that the "face-to-face" contact of going to peoples' homes is important in his business to show that the business is credible. He testified that once people realize that he does not pose a threat, they often invite him in and even cook dinner for him sometimes.

connection with 1st National's efforts to obtain the funds. Woodford followed up the visit by email dated August 5, 2010 [Pl.Ex. 2] with a copy of the agreement, assignment of rights, and a limited power of attorney to be signed.

The Debtors were curious about the source of the funds and thought that they may come from the estate of Debtor Jason Anderson's father who was deceased. In addition, their financial situation was "terrible" [Tr. p. 104]. To appease their curiosity and because of their financial condition, the Debtors decided to sign the agreement. The agreement and limited power of attorney were signed by both Debtors on August 8, 2010 [Def. Ex. A].[4] Woodford signed the agreement on behalf of 1st National. The agreement allowed 1st National to obtain the $74,102.60 in exchange for payment of 45% of the recovery or roughly $33,000. Once the agreement was signed, Woodford revealed to the Debtors that the source of the $74,102.60 was the Delaware County foreclosure litigation.

## C. Release of the Proceeds by the Delaware County Court

On August 9, 2010, Attorney Neal filed a motion on behalf of the Debtors for distribution of the $74,102.60 being held by the Clerk of Courts for Delaware County [Tr. p. 96; Pl.Ex. 15]. The motion requested that the funds be distributed to the Andersons, in the care of Attorney Neal, their "counsel" [Id.]. The Debtors were not made aware of this filing nor did they meet or even speak with Attorney Neal prior to the filing [Tr. p. 96].

A party in the foreclosure action, Deutsche Bank filed a response to Attorney Neal's motion for distribution on August 24, 2010 [Pl.Ex. 16]. In the response, Deutsche Bank asserted that the $74,102.60 was property of the Debtors' bankruptcy estate and that the Chapter 7 Trustee assigned to the case must be notified and given an opportunity to collect the funds on behalf of creditors [Id.].

On August 25, 2010, apparently before review of Deutsche Bank's response, the Delaware County Court issued an Order for Distribution of the Funds [Pl.Ex. 17]. The funds were released to the Debtors care of Attorney Neal [Id.] via a check made payable to the Debtors [Tr. p. 158]. Attorney Neal then turned the check over to Woodford who deposited the check, using the limited power of attorney, in 1st National's account with U.S. Bank on August 31, 2010 [Tr. pp. 158–60, 187; Pl.Ex. 4]. Only Woodford had the authority to write checks or withdraw money from the account [Tr. pp. 160–61].[5]

Deutsche Bank filed a motion to reconsider on September 1, 2010 [Pl.Ex. 18] leading the Delaware County Court to issue a September 9, 2010 judgment entry [Pl.Ex. 19] ordering the Debtors, through their counsel Attorney Neal, to hold the funds pending a determination by the bankruptcy court regarding the reopening

---

4. The Trustee obtained a different copy of a 1st National agreement that is signed solely by Debtor Erica Anderson and not Debtor Jason Anderson [Pl.Ex. 3]. No explanation is given for this copy missing Jason's signature. Because Debtor Jason Anderson testified to signing the agreement [Tr. pp. 90–91, 98–99], the court determines, and the parties agree, that the agreement signed by both Debtors is the valid copy [Def. Ex. A, Tr. p. 211].

5. Although this is a 1st National account, at least occasional withdrawals from the account were for personal expenses of Woodford including violin purchases and pediatric care for his children [Pl.Ex. 4; Tr. pp. 180–81]. In addition, Woodford sometimes uses his own personal funds to "pump into" 1st National's business to keep it afloat. [Tr. pp. 203–04].

of the bankruptcy case and how the funds should be disbursed [*Id.*].[6]

### D. Trustee Notification and Attempt to Recover the Foreclosure Proceeds

Shortly after the release of the funds to Attorney Neal, Deutsche Bank's counsel, Gregory Stout, contacted the Trustee via phone and a faxed letter dated August 31, 2010 [Pl.Ex. 10]. He notified her of the funds being held in the foreclosure action and his belief that they were property of the bankruptcy estate. He also alerted the Trustee that the Debtors had filed a motion for disbursement of the funds and that the court had entered an order allowing the distribution.

On the same day that she received this notification, the Trustee filed a motion to reopen the bankruptcy case in order to administer the funds from the foreclosure.[7] She also reviewed the Delaware County Court docket to determine who had filed the motion for disbursement on behalf of the Debtors. She discovered that Attorney Neal had filed the motion as counsel for the Debtors and she attempted to contact him by both phone and email. She left messages explaining her belief that the funds he was attempting to recover were property of the Debtors' bankruptcy estate. She received no response.

She then contacted Debtors' bankruptcy counsel, Andrew Ziegler, who, contacted the Debtors and obtained a copy of their contract with 1st National. He forwarded a copy to the Trustee on September 2, 2010. The contract included a phone number for Carl Woodford.

The Trustee called Woodford on September 2, 2010. Both the Trustee and Woodford agree that a contentious conversation ensued. The Trustee testified that she spoke with Woodford and explained who she was and that she believed that the money belonged to the Debtors' bankruptcy estate. She asked him to turn over the funds to her so that she could disburse them to creditors. She also warned Woodford not to spend the money because she was prepared to go to court and seek sanctions if necessary. She testified that Woodford was "difficult" and "accusatory" stating that he felt the money was his and threatening to refer her to the "bar" for dishonesty. She stated that Woodford left similar threats in subsequent voice mail messages.

Woodford also testified about the phone call with the Trustee noting that the Trustee had a "very nasty" and "very aggressive approach" making demands and telling Woodford that he was not entitled to anything for the work he had done to discover and recover the funds. Woodford admitted he was not in the best of spirits that day, dealing with a separate crisis. He questioned her identity as a bankruptcy trustee and refused her demands for turnover at which point she threatened to sue. Woodford retorted that just because she was a trustee did not mean she was right and noted that he had encountered trustee mistakes before in his job.

The Trustee followed up her phone conversation with a letter providing proof that she was the Trustee for the Debtors' bankruptcy case and asking, again, for the funds to be turned over to her [Pl.Ex. 11].

---

6. Woodford testified that he did not receive a copy of the Delaware County order to hold the funds until notified of it by the Trustee long after the funds were paid [Tr. pp. 184–85].

7. Subsequently, the Trustee filed an amended motion to reopen on September 9, 2010.

## E. The Withdrawal of the Proceeds from 1st National's Account and Debtors' Assignment of Rights

On September 1, 2010, a day after the money was deposited into 1st National's account, Woodford withdrew $5,000 [Tr. p. 174]. On September 3, 2010, a day after the phone conversation with the Trustee, Woodford withdrew an additional $62,009.00 from 1st National's U.S. Bank account [*Id.*]. Woodford testified that the money was used to pay bills and "pay people I owed money to." [*Id.*].

At some point after the September 2, 2010 phone call between Woodford and the Trustee, Woodford made a second offer to the Debtors, more specifically, an assignment of rights [Tr. pp. 165, 198]. The assignment of rights, an offer Woodford routinely makes to 1st National clients, would allow 1st National to keep a much larger amount of the recovered funds in exchange for an immediate lump sum payment to the Debtors. Debtor Jason Anderson indicated to Woodford that the Debtors wanted to be "cashed out" because of their tight financial situation [Tr. pp. 162, 165]. Subsequent to the conversation, Woodford drove to the Debtors' residence with $5,000.00 in cash that he was prepared to give them as a lump sum in exchange for Woodford retaining the foreclosure funds. However, the Debtors refused the $5,000.00 offer stating that they needed $8,000.00. Woodford agreed to the higher amount and told them he would be back in about two days with the cash and some paperwork.

When Woodford attempted to take the $8,000 in cash and agreement over for signature, Debtor Jason Anderson pretended to be stuck at work [Tr. p. 103]. According to both Debtors' testimony, they made excuses because, at that point, they realized that the funds were part of the bankruptcy estate and they just wanted the whole thing to go away [Tr. pp. 103, 105–06, 111, 116–17].

Eventually, Debtor Jason Anderson contacted Woodford and told him that he had spoken with his bankruptcy attorney and was fearful to take the money because he believed it belonged to the bankruptcy estate. Woodford told him that he had analyzed the case and in his estimation, the bankruptcy trustee was not entitled to anything [Tr. pp. 163, 169–70]. Nonetheless, the Debtor decided not to go through with the lump sum pay out and told Woodford he could just keep the money [Tr. pp. 103, 163, 169]. Woodford considered this an oral agreement and, although such agreements were not routine for Woodford, he testified that he believed that the oral agreement was valid. Consequently, 1st National and Woodford kept the $74,102.60 and the Debtors have never seen or received even "a dime" of it [Tr. pp. 97, 106].

## *LEGAL ANALYSIS*

### I. Claims Against the Debtors Dismissed

As a preliminary matter, the court will deal with the Trustee's causes of action against Debtors Jason and Erica Anderson specified in the Trustee's Second Amended Complaint [Adv. Doc. 75]. During the March 26, 2013 trial, the Debtors testified that they did not know of the $74,102.60 remaining in the foreclosure action during the pendency of their bankruptcy case and have never received "a dime" of the proceeds. For this reason, the Trustee made the determination that she would not seek turnover or recovery of damages from the Debtors [Tr. p. 216], in essence, abandoning all claims against the Debtors. Consequently, the Trustee's causes of action against Debtor–Defendants Jason and Erica Anderson are dismissed.

## II. Claims Against 1st National and Woodford

Turning to the claims against the remaining Defendants, the Trustee seeks recovery of the $74,102.60 in foreclosure proceeds, as well as damages, from Defendant 1st National under theories of violation of the automatic stay and turnover of estate property, conversion, and unauthorized post-petition transfer of estate property. Furthermore, the Trustee asserts that the funds can be recovered from Defendant Woodford by piercing the corporate veil. Defendants raise various defenses to these actions including abandonment of the asset by the Trustee, the expiration of two statutes of limitation, Defendants' good faith, and res judicata. Before addressing each of the Trustee's claims and the applicable defenses in turn, the court will begin by discussing why the foreclosure proceeds are, indeed, property of the Debtors' estate that were not abandoned upon the closing of the case.

### A. Foreclosure Proceeds Constitute Unabandoned Property of the Estate

■ No one questions the fact that the $74,102.60 in proceeds remaining following the pre-petition foreclosure sale of the Debtors' condo constituted property of the estate under 11 U.S.C. § 541(a) at the time the Debtors filed their bankruptcy case. As such, the Debtors had a duty to schedule the proceeds as an asset and turn over any non-exempt portion to the Trustee. 11 U.S.C. § 521 and § 542; Fed. R. Bankr.P. 4002. These required acts did not occur in this case. The Debtors listed neither the real estate itself nor the proceeds from the sale of the real estate as assets in their schedules. Although the Debtors mention the prepetition foreclosure action and sale of their condo in their Statement of Financial Affairs, this listing is insufficient to alert the Trustee or other creditors of the remaining proceeds in which the Debtors had a property interest. Instead, the Debtors' Schedule F lists a mortgage creditor owed a "deficiency balance" on the condo suggesting that the proceeds from the foreclosure were insufficient to pay even the secured lienholders. Furthermore, when the Trustee questioned the Debtors about the foreclosure during the § 341 meeting, the Debtors corroborated the veracity of their schedules with testimony that the condo was sold and gone and no money was owed to them.

■ It is significant that the Debtors did not schedule the funds as an asset or reveal the funds at the § 341 meeting because property that is not scheduled by the Debtors or administered by the Trustee is not abandoned when the case is closed and remains property of the estate. 11 U.S.C. § 554(d). *See also In re Kopp,* 374 B.R. 842, 847 (Bankr.D.Kan.2007) ("Section 554 removes property from the estate only after an informed decision by the trustee."); *In re Lehosit,* 344 B.R. 782, 784 (Bankr.N.D.W.Va.2006). As property of the estate that is not administered or abandoned, the funds also remained protected by the automatic stay. *Kopp,* 374 B.R. at 847.

### B. Theories of Recovery Based on the Debtors' Voluntary Post–Petition Transfer of Estate Property

■ Because the foreclosure proceeds remained property of the estate after the case was closed, the question becomes whether the Trustee can recover the proceeds and/or other damages in this reopened case and, if so, under what theory of recovery. The Trustee argues that 1st National and/or Woodford attempted to obtain an interest in and exert control over the foreclosure proceeds in violation of the automatic stay provisions of 11 U.S.C.

§ 362 [8] which caused the transfer to be void and the defendants subject to sanctions. Alternatively, the Trustee argues that the defendants are required to turn over the funds as entities in possession of property of the estate pursuant to 11 U.S.C. § 542.[9] As another alternative, the Trustee asserts that the transfer of the funds to the Defendants is avoidable as an unauthorized post-petition transfer pursuant to 11 U.S.C. § 549 [10] and recoverable under 11 U.S.C. § 550.

Ultimately, determining which theory permits a recovery by the Trustee from the Defendants rests on how 1st National and Woodford obtained possession of the funds. On August 8, 2010, the Debtors signed an agreement with 1st National giving the company 45% or roughly $33,000 of the proceeds as a recovery fee. Subsequently, the Debtors told Woodford to keep all of the foreclosure proceeds fearing that if they took even a $5,000.00 or $8,000.00 cash buyout, it could subject them to consequences from the Trustee and bankruptcy court.

■ Through these written and oral agreements, the Debtors voluntarily parted with or "transferred" the estate's interest in the foreclosure proceeds. 11 U.S.C. § 101(54)(D) (noting that a "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property). Although there is some dispute in this area and there may be some overlap between § 362 and § 549, courts in this circuit and elsewhere have generally agreed that no violation of the automatic stay occurs when a debtor voluntarily transfers estate property to a creditor. *See Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 574 (9th Cir.1992) (resolving the apparent conflict in coverage between § 362 and § 549 by concluding that § 362's automatic stay "does not apply to sales or transfers of property initiated by the debtor"); *Rathbone v. Lake (In re Consolidated Partners Inv. Co.)*, 156 B.R. 982, 984–85 (Bankr.N.D.Ohio 1993) (noting that transfers made voluntarily by a debtor to a creditor are not an act against the debtor or property of the debtor and do not violate the automatic stay making § 549 the only method of avoiding such post-petition transfers). These courts note that if the automatic stay applied to void debtor initiated post-petition transfers, it would render a trustee's ability to avoid unauthorized post-petition transfers pursuant to § 549 largely superfluous.[11]

---

**8.** Bankruptcy Code Section 362, a debtor protection statute, prohibits almost all acts against a debtor or property of the estate including any act to obtain or exercise control over property of the estate. 11 U.S.C. § 362(a). Actions deemed in violation of the automatic stay are "invalid, voidable and shall be voided absent limited equitable circumstances." *Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 911 (6th Cir.1993).

**9.** Bankruptcy Code Section 542 provides that: "... an entity, other than a custodian, in possession, custody or control, during the case, of property of the estate ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

**10.** Bankruptcy Code § 549 provides in pertinent part:
(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.
11 U.S.C. § 549(a).

**11.** There is a contrary judicial determination that the automatic stay is applicable to void

*Schwartz,* 954 F.2d at 573–74; *Rathbone,* 156 B.R. at 985. Such a broad reading of the voiding power of the automatic stay would serve to sidestep the creditor protections found in § 549 such as the two year statute of limitation as well as the exception to avoidance for good faith purchasers of real estate found in § 549(c). *Schwartz,* 954 F.2d at 574; *Rathbone,* 156 B.R. at 984–85.

Courts concluding that § 362 was not intended to supplant § 549 in this fashion have more support in an exception to the automatic stay enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Pursuant to 11 U.S.C. § 362(b)(24), the automatic stay does not apply to "... any transfer that is not avoidable under section 544 and that is not avoidable under section 549." 11 U.S.C. § 362(b)(24). It has been acknowledged that this provision is "one of the oddest and perhaps the most poorly drafted of the BAPCPA provisions dealing with the automatic stay" and the legislative history is not particularly illuminating.[12] *Morton v. Kievit (In re Vallecito Gas, LLC),* 440 B.R. 457, 481 n. 22 (Bankr. N.D.Tex.2010) (citing David B. Young, *"BAPCPA's Changes to the Automatic Stay: the 2005 Amendments and Court Decisions,"* 906 PLI/Comm. 11 (2008)). Nonetheless, this provision's language supports that if a debtor initiated post-petition

transfer of estate property cannot be avoided by a trustee using the provisions of § 549, then it is also excepted from, and not voided by, the automatic stay. *Vallecito Gas,* 440 B.R. at 481. *See also Hopkins v. SunTrust Mortgage, Inc. (In re Ellis),* 441 B.R. 656, 663 (Bankr.D.Idaho 2010); *In re Ducker,* 2007 WL 1119640, at \*2 (Bankr.E.D.Ky. April 3, 2007); *In re Striblin,* 349 B.R. 301, 303–04 (Bankr.M.D.Fla. 2006). In other words, the Trustee cannot side step the limitations found in § 549 by asserting that an unauthorized transfer is also void in violation of the automatic stay.

 Pursuant to this analysis, a trustee must use 11 U.S.C. § 549, rather than 11 U.S.C. § 362, to recover estate property that the debtor voluntarily transfers after the bankruptcy filing. *Schwartz,* 954 F.2d at 574; *Buckeye Check Cashing, Inc. v. Meadows (In re Meadows),* 396 B.R. 485, 496 (6th Cir. BAP 2008) ("Various courts have recognized that the appropriate vehicle to recover post-petition transfers is via a § 549(a) avoidance action."); *Rathbone,* 156 B.R. at 985 (concluding that § 549 is the exclusive means of avoiding a post-petition transfer); *In re 31–33 Corp.,* 100 B.R. 744, 747 (Bankr.E.D.Penn.1989). Furthermore, upon a debtor's voluntary transfer of estate property, the property ceases to be property of the estate and, consequently, is no longer recoverable via

---

voluntary post-petition transfers by a debtor and that § 549 is not rendered superfluous by this application. *Gonzales v. Beery (In re Beery),* 452 B.R. 825 (Bankr.D.N.M.2011). However, to reach this determination, the *Beery* court concludes that § 549 and § 362 largely overlap and suggests that § 549's only separate application is to avoid unauthorized transfers of a Chapter 11 debtor-in-possession by a subsequent trustee. *Beery,* 452 B.R. at 833–34. This court disagrees with *Beery* given that the language of § 549 does not suggest such limited application. Furthermore, *Beery*'s conclusion is questionable post-

BAPCPA given the newly created exception to the automatic stay for transfers that are not avoidable under § 549. *See* 11 U.S.C. § 362(b)(24).

12. The legislative history suggests that § 362(b)(24) was intended to protect purchase money lenders who record their purchase-money deed of trust, i.e. create a lien, post-petition, but the language of the automatic stay exception suggests a much broader application. *See Morton v. Kievit (In re Vallecito Gas, LLC),* 440 B.R. 457, 481 & n. 20 (Bankr.N.D.Tex.2010).

a turnover action under 11 U.S.C. § 542.[13] *Meadows*, 396 B.R. at 493–94; *Rosen v. Dahan (In re Minh Vu Hoang)*, 469 B.R. 606, 620–21 (D.Md.2012). *See also Liquidating Trustee v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 122 (Bankr. S.D.Ohio 2007) (noting that recovery under § 542 is limited to assets that are undisputedly property of the estate and cannot be used to demand return of assets subject to a title dispute or an unavoided transfer).

For these reasons, the Trustee must utilize 11 U.S.C. § 549 to avoid the transfer of the foreclosure proceeds to Defendants 1st National and Woodford.

## C. Avoidance of Unauthorized Post-Petition Transfer Pursuant to 11 U.S.C. § 549

### 1. Elements

▪ The Trustee contends that the Debtors' transfer of the foreclosure proceeds to 1st National constitutes an unauthorized post-petition transfer that may be avoided under 11 U.S.C. § 549. This provision of the Bankruptcy Code provides in relevant part:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). To avoid transfers under this provision, the Trustee must establish four elements: 1) that the unauthorized transfer occurred after the commencement of the case; 2) that the transfer involved property of the estate; 3) that the Debtors transferred the property; and 4) that the transfer was not authorized by the court or the Bankruptcy Code. *Cohen v. KDC Fin. Servs., Inc. (In re Miller Mining, Inc.)*, 219 B.R. 219, 221–22 (Bankr.N.D.Ohio 1998).

▪ In this case, the Trustee meets all four elements. The transfer to 1st National not only occurred after the bankruptcy case had commenced, but also after the Debtors' discharge and closure of the bankruptcy case. Second, as noted previ-

---

**13.** The Trustee also contends that Defendants 1st National and Woodford converted estate property when they exerted control over the foreclosure proceeds in a manner inconsistent with the bankruptcy estate's interest in the funds. Although never raised by the parties, the court questions its Constitutional authority under Article III to make a final determination on the Trustee's state law conversion claim against non-creditor defendants. *See Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 2614–18, 180 L.Ed.2d 475 (2011). Nonetheless, the issue deserves discussion and the court's analysis leaves it with the firm belief that the Trustee's conversion claim must be denied. Conversion is an "exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Dice v. White Family Cos., Inc.*, 173 Ohio App.3d 472, 878 N.E.2d 1105, 1108–09 (2007). To

prove conversion under Ohio law, a plaintiff must demonstrate: 1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and 3) damages. *Id.* at 1109. In this case, while the Trustee may have had a claim for conversion against the Debtors, any claim of conversion against 1st National and Woodford fails. Upon the Debtors' voluntary *transfer* of funds to Defendant 1st National, the funds ceased to be part of the bankruptcy estate. *See, Meadows*, 396 B.R. at 493–94. Consequently, 1st National and Woodford did not exert control over the funds in a manner inconsistent with the rights of the Trustee because the estate no longer had an interest in the funds. Again, this conclusion supports that a Trustee must pursue the transferee of an unauthorized post-petition transfer via the statutory vehicle provided in 11 U.S.C. § 549.

ously, because the property was neither scheduled nor abandoned by the Trustee, it remained property of the estate at the time of the transfer. 11 U.S.C. § 554(d). *See also Kopp,* 374 B.R. at 846–47; *Lehosit,* 344 B.R. at 784. Third, the Debtors are the parties who effectuated the transfer of the foreclosure proceeds to 1st National. Finally, no one disputes that the transfer of the foreclosure proceeds to 1st National was not authorized by this court or any provision of the Bankruptcy Code.

### 2. Statute of Limitation Defense

Although the Trustee meets the § 549(a) elements, there are defenses to avoidance and the Defendants specifically raise the statute of limitation found in 11 U.S.C. § 549(d) which provides:

> (d) An action or proceeding under this section may not be commenced after the earlier of—
>
>> (1) two years after the date of the transfer sought to be avoided; or
>>
>> (2) the time the case is closed.

11 U.S.C. § 549(d).[14] The Defendants note that the bankruptcy case was closed on May 26, 2010 and the Trustee's action was not commenced until September 23, 2010, well after the closure of the case. Thus, the Defendants assert that the Trustee's § 549 action is barred by the statute of limitation found in § 549(d)(2).

▆▆▆▆ While admitting that the dates implicate the statute of limitation in § 549(d)(2), the Trustee argues that it can be tolled for equitable reasons found in this case.[15] The common law doctrine of equitable tolling is "read into every federal statute of limitation" including the statute

of limitation found in 11 U.S.C. § 549(d). *Consolidated Partners Inv. Co. v. Lake,* 152 B.R. 485, 492 (Bankr.N.D.Ohio 1993) (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946)). *See also Morton v. Kievit (In re Vallecito Gas, LLC),* 461 B.R. 358, 397–98 (Bankr. N.D.Tex.2011). The applicability of equitable tolling is a fact based decision and, consequently, "the bankruptcy court determines whether equitable tolling governs in any given case." *Moratzka v. Pomaville (In re Pomaville),* 190 B.R. 632, 636 (Bankr.D.Minn.1995).

▆▆▆▆ The § 549(d) statute of limitation may be tolled using the doctrine of equitable tolling when, through active or passive concealment, the Trustee does not learn of the critical facts needed to file a timely avoidance action. *Vallecito Gas,* 461 B.R. at 398; *Barkley v. West (In re West),* 474 B.R. 191, 197–98 (Bankr. N.D.Miss.2012); *Consolidated Partners,* 152 B.R. at 492. Generally, courts look to the fraudulent or concealing acts of the defendant to determine whether equitable tolling is appropriate. *See Vallecito Gas,* 461 B.R. at 398–99. However, as one bankruptcy judge noted, "[a] bankruptcy case presents a rather different slant on equitable tolling." *Pomaville,* 190 B.R. at 637. The judge explained:

> In the typical situation, it is the debtor's conduct rather than the defendant's conduct which invokes equitable tolling. In some senses, this is unfair to the defendant. On the other hand, unlike the usual civil case where a plaintiff at least has the advantage of being a party to the underlying transaction, a bankruptcy trustee must rely almost entirely on a

---

**14.** There are other defenses to avoidance found in 11 U.S.C. § 549(b) and (c) which were not raised by the Defendants and are not applicable in this case.

**15.** In her pre-trial brief, the Trustee concluded that she was, in fact, barred by the statute of limitation. However, at trial she asserted that the statute could be equitably tolled under the circumstances involved in her case.

third party (the debtor) to provide the information necessary to uncover avoidable transfers.

*Id.* Consequently, the statute of limitation may be tolled in this case if the Trustee was unable to discover the assets and avoidable transfers in time to file a timely action due to concealment of the underlying facts by the Debtors.

■■■■ In order to invoke the doctrine, the Trustee must show that the underlying facts critical to the § 549 action, i.e. the existence of the foreclosure proceeds and their transfer to 1st National, were either actively or passively concealed by the Debtors. *Vallecito Gas,* 461 B.R. at 398; *Pomaville,* 190 B.R. at 637. If active concealment is demonstrated, requiring proof that the Debtors actively misled the Trustee, the statute does not run until the Trustee gains actual knowledge of the transfer. *Vallecito Gas,* 461 B.R. at 398. If, instead, equitable tolling is based on passive concealment, the Trustee must have exercised reasonable diligence to discover the fraud. *Id.*

In this case, the Trustee admitted at the hearing that the Debtors did not intentionally fail to disclose the foreclosure proceeds during the bankruptcy case based on their credible testimony that they did not know about the proceeds at that time. Consequently, the Trustee asserts that this is a case of passive concealment. The court agrees that a passive or negligent concealment did occur via the Debtors' failure to properly schedule their interest in the foreclosure proceeds or reveal the existence of the proceeds at the § 341 meeting. Because this is a case of passive concealment, the Trustee must show reasonable diligence to discover the concealment.

■■■■ Reasonable or due diligence is measured by an objective standard and requires the Trustee to demonstrate that she engaged in reasonable care in seeking to learn facts which would have disclosed the fraud or concealment. *Pomaville,* 190 B.R. at 637. Due diligence requires a trustee to engage in conduct that is realistic in the ordinary course of her duties but does not require the trustee to conduct searches that are so extensive that service as a trustee is rendered economically implausible. *Id.; Brook v. Alphamed Pharmaceuticals Corp. (In re J & D Sciences, Inc.),* 335 B.R. 791, 797–98 (Bankr. M.D.Fla.2006). For instance, due diligence would not require a trustee to routinely conduct property searches to look for property which the debtor failed to schedule unless there is some indication of errors or omissions in the debtor's documentation. *Pomaville,* 190 B.R. at 637; *J & D Sciences, Inc.,* 335 B.R. at 798 (noting it is "wholly unrealistic" and "economically implausible" to require a Chapter 7 panel trustee to conduct property searches in the ordinary course of his or her duties when the trustee's statutory minimum compensation is $60.00 per case). Furthermore, amendments to the Bankruptcy Code in 2005 strongly emphasized the responsibility of a debtor and his counsel to conduct "reasonably diligent inquiry" to ensure the accuracy and completeness of all information required in the petition, schedules, and statement of financial affairs. *See* 11 U.S.C. § 527(c). Arguably, such legislative pronouncements provide additional justification for a trustee's reliance upon information provided by debtors and their counsel.

■■■■ Consequently, a trustee's reliance on the sworn schedules and statements by a debtor is entirely reasonable in most instances. *J & D Sciences, Inc.,* 335 B.R. at 798 (citing *In re Levy,* 185 B.R. 378, 386 (Bankr.S.D.Fla.1995); *Pomaville,* 190 B.R. at 637). However, if sufficient "storm warnings" exist that would alert a reason-

able person to the possibility that an error or omission in the schedules or other filings has occurred, then the party is put on "inquiry notice" requiring investigation beyond the debtor's schedules and testimony. *Markus v. Fried (In re Geneva Steel LLC)*, 389 B.R. 231, 240–41 (Bankr.D.Utah 2008).

■ After careful analysis of the facts in light of the standard described above, the court concludes that the Trustee conducted reasonable diligence in the course of her duties. The Trustee reviewed and relied on the Debtors' schedules, signed under penalty of perjury, which did not list an interest in real estate or in proceeds from a foreclosure sale. Although the Debtors mention the prepetition foreclosure action and sale of their condo in their Statement of Financial Affairs, the Debtors do not indicate any remaining proceeds from the sale. Instead, in Schedule F, the Debtors list a mortgage creditor owed a deficiency balance on the condo indicating that the proceeds from the foreclosure were insufficient to pay the secured lienholders. The Trustee followed up her review of the schedules by questioning the Debtors about the foreclosure during the § 341 meeting. At that point, the Debtors corroborated the veracity of their schedules with testimony that the condo was sold and no money was owed to them.

Although the Defendants argue otherwise, the fact that a debtor's Statement of Financial Affairs indicates a pre-petition foreclosure sale is not, by itself, a "storm warning" requiring review beyond the schedules and questioning at the § 341 meeting. Debtors are often behind on payments and foreclosure proceedings are often initiated before the debtors reach the decision to file a bankruptcy petition.

Consequently, foreclosure proceedings show up frequently in a debtor's bankruptcy filings. To require a trustee, paid a statutory minimum of $60.00 per case,[16] to conduct a review of state court dockets and records every time she encounters a pre-petition foreclosure proceeding listed in a debtor's filings is not economically feasible. This is especially true in a case like this one where the Debtors' statements in their Schedule F, Statement of Financial Affairs, and testimony at the § 341 meeting of creditors were entirely consistent and corroborate that the foreclosure sale was over and that no proceeds remained for the estate.

Next, Defendants argue that the proposed order that crossed the Trustee's desk requesting agreement to relief from the automatic stay so that a party could finalize the foreclosure proceeding is a "storm warning" that should have triggered a state court docket review. The court disagrees. The Trustee signed off on a proposed order granting the condo association relief from the stay to continue final post-judgment proceedings related to the foreclosure and complete the confirmation of the foreclosure sale on the condo. As the Trustee noted in her testimony, such agreed orders drafted by a party to a foreclosure are routinely filed and the one from the condo association did not reveal any remaining funds for the estate following the foreclosure sale.

Instead, the first "storm warning" that the Trustee received alerting her to the existence of the foreclosure proceeds was the phone call and faxed letter from Deutsche Bank's counsel Gregory Stout on August 31, 2010. On the same day that she received this notice, the Trustee filed a

---

**16.** The minimum fee proscribed in 11 U.S.C. § 330(b) is for general trustee duties although the trustee may be entitled to more fees in "asset" cases, i.e. cases with assets that can be recovered and disbursed to creditors. *See* 11 U.S.C. § 326(a).

motion to reopen the bankruptcy case and proceeded to review the state court docket. The Trustee, after conducting some additional investigation, filed the adversary complaint to recover the funds on September 23, 2010, well within a month of first learning of the foreclosure proceeds and their transfer.

With that, the Trustee has demonstrated reasonable diligence in her reliance on the Debtors' schedules, Statement of Financial Affairs and sworn testimony at the § 341 meeting that consistently supported the lack of funds for the estate resulting from the pre-petition foreclosure sale. Furthermore, she acted quickly once alerted to the existence of the foreclosure proceeds and the transfer to Defendant 1st National; she filed the adversary complaint in less than a month after the discovery. As such, the court concludes that statute of limitation found in 11 U.S.C. § 549(d) is equitably tolled and does not act as a bar to the Trustee's § 549 action against the Defendants. Because the Trustee has met the elements for avoidance pursuant to § 549, and the statute of limitation is equitably tolled, the Trustee may avoid the transfer of $74,102.60 to Defendant 1st National.

### D. Recovery of Avoided Transfer from Initial and Immediate Transferees: 11 U.S.C. § 550

Having determined that the transfer is avoidable pursuant to § 549, the court must determine whether the Trustee may recover the avoided transfer, or the value thereof, from Defendants 1st National and/or Woodford pursuant to 11 U.S.C. § 550. *See Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 532 (6th Cir.2003) (explaining that avoidance of a transfer and recovery are distinct concepts and processes that are addressed in separate sections of the Bankruptcy Code); *SKK*

*Liquidation Trust v. Green & Green, LPA (In re Spinnaker Indus., Inc.)*, 328 B.R. 755, 763 (Bankr.S.D.Ohio 2005). Bankruptcy Code Section 550 provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) and (b). Significantly, direct transferees of the debtor " 'are not entitled to avail themselves of the [good faith] defense set forth in § 550(b)(1).' " *Spinnaker*, 328 B.R. at 762 (further citation omitted). In other words, the direct transferee of a debtor's transfer is held strictly liable. *Hurtado*, 342 F.3d at 532. However, in the case of immediate or mediate transferees of an initial transferee, "recovery is barred if the transferee 'takes for value, ... in good faith, and without knowledge of the voidability of the transfer avoided.' " *Spinnaker*, 328 B.R. at 762 (citing the language of § 550(b)(1)).

In this case, Defendants argue that Attorney Neal, rather than 1st National, is the party who initially received

the check for $74,102.60 in foreclosure proceeds and, consequently, should be considered the "initial transferee" for § 550 purposes. The court disagrees. The Sixth Circuit applies the "dominion and control" test to determine who is a transferee. *See Hurtado*, 342 F.3d at 533; *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 722 (6th Cir.1992). Under this test, a minimum requirement for status as a transferee is "dominion over the money or other asset, the right to put the money to one's own purposes." *Baker & Getty*, 974 F.2d at 722 (relying on the test spelled out by the Seventh Circuit in *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893–94 (7th Cir.1988)). Consequently, when "A gives a check to B as an agent for C, then C is the 'initial transferee'; the agent may be disregarded.'" *Hurtado*, 342 F.3d at 533 (citing *Bonded*, 838 F.2d at 893).

▪ In this case, the Delaware County Court released the check for the foreclosure proceeds to Attorney Neal, but the check was not made payable to him. Instead, the check was made payable to the Debtors. Attorney Neal turned the check directly over to Woodford who deposited the check, using the limited power of attorney he obtained, in 1st National's bank account [Tr. pp. 158–60, 187; Pl.Ex. 4]. Only Woodford had the authority to write checks or withdraw money from the ac-

count [Tr. pp. 160–61]. These facts illustrate that Attorney Neal was nothing more than a conduit or agent for 1st National; he did not have the authority to use the check for his own purposes and did not exert dominion and control over the $74,102.60. Instead, it is 1st National, the entity contracting with the Debtors and into whose account the foreclosure proceeds were deposited, that first controlled the funds; consequently, 1st National is the initial transferee for § 550 purposes. As the initial transferee, 1st National is subject to strict liability and turnover of the funds to the Trustee pursuant to 11 U.S.C. § 550(a)(1).

▪ Next the court must determine whether the transferred funds can be recovered from the other remaining defendant, Woodford, as an immediate transferee.[17] Bankruptcy Code Section 550(a)(2) provides that, upon avoidance of a transfer under § 549, a Trustee can recover the property transferred from any "immediate or mediate transferee of [the] initial transferee." 11 U.S.C. § 550(a)(2). An immediate or mediate transferee is "simply one who takes in a later transfer down the chain of title or possession." *Baker & Getty*, 974 F.2d at 722. Woodford became a subsequent or "immediate" transferee of 1st National when he withdrew $5,000.00 of the foreclosure proceeds from 1st National's account on September 1, 2010 and another $62,009.00 on September 3, 2010

---

**17.** The Trustee's Second Amended Complaint only contains a § 550 claim against 1st National, but Woodford is a named defendant and the Complaint includes a claim for piercing the corporate veil and a prayer for relief seeking recovery of the funds from Woodford. Furthermore, it is clear from the trial, including Woodford's testimony regarding his withdrawal of the proceeds from 1st National's account, that Woodford could be considered an "immediate transferee" for § 550 purposes. Consequently, counsel for both parties touched upon the issue in closing arguments

[Tr. pp. 222–23, 230, 235–36]. Pursuant to Fed. R. Bankr.P. 7015(b)(2) and the implied consent of both parties at trial, the court construes the complaint to include a § 550 claim for recovery against Woodford. Furthermore, the claim "relates back" to the original filing date of the complaint because Woodford is a named defendant in the original complaint and the new claim arises out of the same conduct and transaction as that set forth in the original pleading. Fed. R. Bankr.P. 7015(c)(1)(B).

to pay bills and "pay people that I owed money to" [Tr. p. 174].[18]

Unlike the initial transferee, a transferee who takes the property in a subsequent transfer receives extra protection and defenses against recovery. *Id.* More specifically, § 550(b)(2) provides that a trustee may not recover from an immediate or mediate transferee if that transferee takes "for value in good faith without knowledge of the voidability of the transfer." *Baker & Getty,* 974 F.2d at 722. The burden of proving the applicability of the defense is on the defendant-transferee. *Spinnaker,* 328 B.R. at 768. In closing arguments, counsel for 1st National and Woodford argued that both defendants took the foreclosure proceeds for "value" and in good faith as part of their contractual recovery service to the Debtors [Tr. p. 235]. Furthermore, counsel asserts that 1st National and Woodford, while having notice of the bankruptcy case and its closure, had no knowledge of the bankruptcy estate's continued interest in the foreclosure proceeds or knowledge of the voidability of the transfer [Tr. p. 236].

The Defendants' argument might be reasonable with respect to 1st National which received the foreclosure proceeds before the Trustee initiated contact with Woodford. However, as noted before, 1st National, is the initial or direct transferee of the Debtors and is not entitled to raise the "good faith" defense found in § 550(b).

*Hurtado,* 342 F.3d at 532; *Spinnaker,* 328 B.R. at 762; *Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.),* 168 B.R. 408, 420 (Bankr.D.Ariz.1994) ("The initial transferee is liable without regard to value, good faith or knowledge—if he is first in the chain, he must pay.").

Woodford, on the other hand, is a subsequent transferee entitled to raise the "good faith" defense. Consequently, the Trustee's recovery from Woodford would be barred if Woodford can prove that he took the proceeds: 1) for value; and 2) in good faith without knowledge of the voidability of the transfer.[19] 11 U.S.C. § 550(b)(1). A transferee is considered to have sufficient "knowledge" negating the defense if the transferee " 'knew facts that would lead a reasonable person to believe that the property transferred was recoverable.' " *Internal Rev. Serv. v. Nordic Vill., Inc. (In re Nordic Vill., Inc.),* 915 F.2d 1049, 1055 (6th Cir.1990) (further citation omitted), *rev'd on other grounds,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Spinnaker,* 328 B.R. at 769 (quoting the Seventh Circuit's definition that "[a] court may infer a lack of good faith if 'the recipient of a voidable transfer ... possessed enough knowledge of events to induce a reasonable person to investigate' the potential voidability issue").

In this case, neither party focused on the first element of the defense—

---

18. The Trustee did not establish at trial what happened to the remaining $7,093.60 in foreclosure proceeds that Woodford did not withdraw. As such, the Trustee did not prove that Woodford is a subsequent transferee with regard to these funds and they cannot be recovered from him.

19. The Sixth Circuit has noted that courts struggle with whether the concepts of "good faith" and "without knowledge of the avoidability of the transfer" in § 550(b)(1) are separate terms or overlap. *First Independence*

*Capital Corp. v. Merrill Lynch Bus. Fin. Servs., Inc. (In re First Independence Capital Corp.),* 181 Fed.Appx. 524, 528, 2006 WL 1342789 (6th Cir. May 16, 2006); *Stevenson v. Genna (In re Jackson),* 426 B.R. 701, 708 (Bankr. E.D.Mich.2010), *aff'd,* 436 B.R. 29 (E.D.Mich. 2010). This court need not reach the issue of good faith and its meaning because it is clear from the evidence that Woodford had knowledge of the potential avoidability of the transfer at the time he withdrew $62,009.00 from 1st National's account.

whether Woodford withdrew the funds for "value" as compensation for his services performed. However, regardless of whether the first element is met, Woodford's defense crumbles upon analysis of the second § 550(b)(1) element, i.e.— whether Woodford withdrew the foreclosure proceeds from 1st National's account in good faith without knowledge of the voidability of the transfer. While it may be argued that 1st National and Woodford lacked sufficient knowledge of the bankruptcy estate's continuing interest in the funds when 1st National entered the contract with the Debtors and recovered the foreclosure proceeds, circumstances changed with the Trustee's phone call to Woodford on September 2, 2010.

The time line, drawn from the facts established at hearing, is as follows. Attorney Neal obtained the $74,102.60 check from the Delaware County Court and turned it over to Woodford who deposited it into a 1st National bank account on August 31, 2010. Woodford then withdrew $5,000.00 of the proceeds from 1st National's account on September 1, 2010. On September 2, 2010, Woodford engaged in the "contentious" telephone conversation with the Trustee. During the telephone conversation, the Trustee explained to Woodford who she was and that she believed that the money belonged to the Debtors' bankruptcy estate. She asked him to turn over the funds to her so that she could disburse them to creditors. The Trustee also warned Woodford not to spend the money because she was prepared to go to court and seek sanctions if necessary. Woodford felt that the Trustee's approach during the conversation was "nasty" and "aggressive" which may well be true. Nonetheless, the Trustee identified herself and provided notice to Woodford of the bankruptcy estate's interest in the foreclosure proceeds and that she intended to recover them on behalf of the estate. On September 3, 2010, a day after the phone conversation with the Trustee, Woodford withdrew a total of $62,009.00 of the foreclosure proceeds from 1st National's bank account.

This timeline leaves no doubt that Woodford's withdrawal of $62,009.00 a day after the telephone conversation with the Trustee was done with the knowledge that the transfer was potentially avoidable and the proceeds recoverable by the Trustee on behalf of the bankruptcy estate. In fact, it could be inferred that the Trustee's phone call is what prompted Woodford to withdraw the funds in an attempt to hide or spend the money before the Trustee could initiate litigation. Consequently, his § 550(b)(1) defense fails to the extent of the $62,009.00 withdrawn after the telephone call with the Trustee.

The only remaining defense to the Trustee's recovery of $74,102.60 from 1st National and/or $62,009.00 from Woodford, who is jointly liable, is a second statute of limitation found in 11 U.S.C. § 550(f). This section provides:

> An action or proceeding under this section may not be commenced after the earlier of—
>
> (1) one year after the avoidance of the transfer on account of which recovery under this section is sought; or
>
> (2) the time the case is closed or dismissed.

11 U.S.C. § 550(f). Like the statute of limitation for avoidance of a post-petition transfer, § 550(f) requires the Trustee to have commenced the litigation prior to the case closing. *Compare* 11 U.S.C. § 549(d) and § 550(f)(2). As such, the Defendants raise the same argument as they did with respect to the § 549(d) statute of limitation. That is, because the Trustee filed the adversary complaint against Defen-

dants after the bankruptcy case was closed, the Trustee's recovery against 1st National and Woodford is barred by the statute of limitation found in 11 U.S.C. § 550(f)(2).

As already noted in this decision, the common law doctrine of equitable tolling is "read into every federal statute of limitation" which includes those found in both 11 U.S.C. § 550(f) and § 549(d). *See Consolidated Partners,* 152 B.R. at 492 *(citing Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946)); *Vallecito Gas,* 461 B.R. at 397–98. Consequently, the § 550(f) statute of limitation may be tolled when, through active or passive concealment, the Trustee does not learn of the critical facts needed to file a timely avoidance and recovery action. *See Vallecito Gas,* 461 B.R. at 398.

In this case, the same facts support tolling both the § 549(d) and § 550(f) statutes of limitation. As such, there is no reason for this court to engage in redundancy and detail those facts a second time. Instead, the court will recite its earlier conclusions that a negligent concealment by the Debtors in their schedules and testimony at the § 341 meeting kept the

Trustee from learning of the critical facts necessary to file a timely action to recover the foreclosure proceeds for the estate. The Trustee engaged in due diligence in the conduct of her duties. Furthermore, she acted quickly once alerted to the existence of the foreclosure proceeds and their transfer to 1st National. Thus, for the same reasons that the court tolled the § 549(d) statute of limitation, the court determines that the statute of limitation found in 11 U.S.C. § 550(f) is equitably tolled and does not bar the Trustee's § 550 claims against the Defendants.

▇▇▇▇ With that, the court concludes that 1st National is the initial transferee under § 550(a)(1) and is liable to the Trustee, as representative of the bankruptcy estate, for $74,102.60. Furthermore, Woodford,[20] as the immediate transferee pursuant to § 550(a)(2), is jointly and severally liable with 1st National with respect to the $62,009.00 Woodford withdrew from 1st National's account on September 3, 2010.

### E. Res Judicata Inapplicable

As a final defense, Defendants argue that the doctrine of res judicata bars the

---

**20.** Because Woodford is an immediate transferee under § 550, the court need not reach the Trustee's alternative theory for reaching Woodford by piercing the corporate veil. To pierce the corporate veil under Ohio law, the Trustee must demonstrate that: (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind; (2) control was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Dombroski v. WellPoint, Inc.* 119 Ohio St.3d 506, 895 N.E.2d 538, 543 (2008). In *Dombroski,* the Supreme Court of Ohio held that the second requirement for piercing the corporate veil requires more than bad faith or unjust acts; instead, the acts must rise to the level of fraud, illegality or unlawfulness. *Id.* at 544–45. In this case,

the Trustee's basis for piercing the corporate veil to reach Woodford was Woodford's alleged act of using 1st National to "convert" the foreclosure proceeds or willfully violate the stay. The court, however, declined to find a willful violation of the stay or a conversion in this case determining, instead, that the defendants obtained the proceeds through a voluntary transfer by the Debtors. Nonetheless, even if the court had determined that 1st National and Woodford converted the funds, it is not clear that the tort of conversion rises to the level of an illegal act under *Dombroski,* which tightened the standard and also held that a "straightforward tort" was not sufficient for veil piercing. *Id* at 545. *See also Wuliger v. Cannella Response Television, Inc.,* 865 F.Supp.2d 836, 847 (N.D.Ohio 2011) (noting that torts like "conversion and unjust enrichment are precisely the types of injustice *Dombroski* excludes" from veil piercing).

Trustee's action because her claim for the proceeds should have been raised in the state court foreclosure case. The Defendants note that on August 25, 2010, the Delaware County Court issued an Order for Distribution of Funds Held by Clerk of Courts [Pl.Ex. 17] distributing the remaining proceeds from the foreclosure sale, $74,102.60, to the Debtors. The Defendants assert that this is a final order on the merits determining that the Debtors were the owners of those proceeds. They further argue that this final order bars the Trustee from claiming a property interest in those proceeds on behalf of the estate. The Defendants' argument is without merit.

Pursuant to 28 U.S.C. § 1738, a federal court is to give the same preclusive effect to a state court judgment as another court of that state would give. *Sill v. Sweeney (In re Sweeney)*, 276 B.R. 186, 189 (6th Cir. BAP 2002) (citing *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461 (6th Cir.1999)). In Ohio, where the Order for Distribution was entered, the doctrine of res judicata encompasses two related preclusionary principles: issue preclusion, also called collateral estoppel, and claim preclusion, also called res judicata or estoppel by judgment. *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 862 N.E.2d 803, 806 (2007).

The difference between the theories is explained by the Supreme Court of Ohio. Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action. *Id.* Issue preclusion, on the other hand, serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies.

*Id.* Issue preclusion applies even if the causes of action differ. *Id.*

In this case, the Defendants meet neither the elements of claim nor issue preclusion with the Order for Distribution. First and foremost, the one paragraph order of distribution does nothing more than order the $74,102.60 of remaining foreclosure funds held by the clerk of courts to be distributed to the Debtors. It does not, nor does it purport to, determine whether the Debtors' property interest in the funds has been succeeded to by the bankruptcy estate. Because the bankruptcy estate's interest in the funds was not determined by the state court order, neither claim nor issue preclusion applies.

Furthermore, for, either claim or issue preclusion to apply, the parties to the subsequent suit must be the same or in privity with the parties to the original suit. *Id.* Although recognizing that it is a somewhat "amorphous" concept, the Supreme Court of Ohio has declared that for privity to exist, there must be "mutuality of interest, including an identity of a desired result." *Id.* ("An interest in the result of and active participation in the original lawsuit may also establish privity.").

In this case, the Trustee, as representative to the bankruptcy estate, was not a party to the foreclosure action. Nonetheless, Defendants assert that preclusionary principles should apply because the Trustee, as representative of the Debtors' creditors, may be considered in privity with the secured creditors that were parties to the foreclosure action. This argument is incorrect.

The bankruptcy trustee does not merely represent particular creditors but, instead, represents all of the creditors of the bankruptcy estate. *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 705 (6th Cir.1999) (noting that a bankruptcy trustee

is not simply the successor-in-interest to the debtor, but represent the interests of all creditors of the debtor's bankruptcy estate); *Rieser v. Dinsmore & Shohl, LLP (In re Troutman Enter., Inc.)*, 356 B.R. 786, 2007 WL 205640, at *7 n. 8 (6th Cir. BAP Jan. 26, 2007); *Williams v. Marlar (In re Marlar)*, 252 B.R. 743, 757–58 (8th Cir. BAP 2000) *aff'd* 267 F.3d 749 (8th Cir.2001). Consequently, unless the secured creditors that were parties to the foreclosure proceeding can be said to have an identity of interest with *all* of the creditors of the bankruptcy estate, including those that are unsecured, no privity exists. *See Troutman*, 356 B.R. at *7 n. 8 (because the bankruptcy trustee represents the interests of all creditors of a bankruptcy estate, the trustee was not bound by a ruling to which only a few creditors were parties); *Marlar*, 252 B.R. at 757–58.

In a foreclosure proceeding, the secured lienholders represent only themselves and their individual interests. They are not trying to collect on behalf of a debtor's unsecured creditors and do not represent the unsecured creditors' interests. As such, no privity exists between the secured creditors who were parties to the foreclosure action and the bankruptcy estate. The court concludes that the Trustee's action is not barred by claim or issue preclusion.

### *CONCLUSION*

All causes of action against Debtor–Defendants Jason and Erica Anderson are dismissed.

The Debtors' transfer of $74,102.60 of estate property to Defendant 1st National Cash Refund, Inc. is avoided under 11 U.S.C. § 549 as an unauthorized post-petition transfer. The Trustee is entitled to recover $74,102.60 from 1st National Cash Refund, Inc. as the initial transferee pursuant to 11 U.S.C. § 550(a)(1). Further-

more, Defendant Carl Woodford is jointly and severally liable to the Trustee for the $62,009.00 he withdrew from 1st National Cash Refund Inc.'s account on September 3, 2010 as an immediate transferee pursuant to 11 U.S.C. § 550(a)(2). All further relief requested by the Trustee is denied.

**SO ORDERED.**